**J. W. BATESON COMPANY, Inc.**

v.

**The UNITED STATES.**

No. 296–69.

United States Court of Claims.

Nov. 12, 1971.

Matthew S. Perlman, Washington, D. C., attorney of record, for plaintiff; Ralph S. Cunningham, Jr., Arent, Fox, Kintner, Plotkin & Kahn, John A. McWhorter, and King & King, Washington, D. C., of counsel.

Mary J. Turner, Washington, D. C., with whom was Asst. Atty. Gen. L. Patrick Gray, III, for defendant.

Before COWEN, Chief Judge, LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

## ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

PER CURIAM:

This case was referred to Trial Commissioner Louis Spector with directions to prepare and file his opinion on the issues of plaintiff's motion and defendant's cross-motion for summary judgment under the order of reference and Rule 166(c). The commissioner has done so in an opinion and report filed on April 13, 1971, wherein such facts as are necessary to the opinion are set forth. Defendant filed a request for review by the court of the commissioner's opinion and the case has been submitted to the court on the briefs of the parties and oral argument of counsel.

Since the court agrees with the opinion and recommended conclusion of the trial commissioner, it hereby adopts the same as the basis for its judgment in this case as hereinafter set forth. Therefore, defendant's cross-motion for summary judgment is denied, plaintiff's motion for summary judgment is granted and judgment is entered for plaintiff. Further proceedings are stayed pursuant to Rule 167 for a period of ninety (90)

days to afford the parties an opportunity to obtain an agency resolution of the equitable adjustment in contract price to which plaintiff is entitled.

## OPINION OF COMMISSIONER

SPECTOR, Commissioner:

This is a contract case arising out of an agreement by plaintiff to construct Federal Office Building No. 8 in Washington, D. C., for the sum of $12,212,800. The contract was with defendant acting through the General Services Administration (hereinafter GSA), which was having the building constructed for occupancy by the Food and Drug Administration.

Plaintiff was to construct only the building. The highly technical laboratory equipment to be purchased and installed for Food and Drug was, under original plans, to be purchased and installed by other independent prime contractors, under separate agreements with GSA.

Defendant prepared drawings and specifications for this laboratory equipment and advertised for bids. When bids were opened, they were deemed by defendant to be excessive when compared with the Government's previously prepared estimates, and the Government rejected all bids. It was thereafter determined to be in the best interest of the Government to have plaintiff furnish and install the lab equipment by an amendment to its contract for construction of the basic building. The Government revised the specifications covering the furnishing and installation of the lab equipment "in an effort to reduce costs,"[1] and an amendment to plaintiff's contract in the amount of $6,303,104, dated August 6, 1963, was negotiated by the parties.

A relatively small part of the lab equipment added to plaintiff's building contract by the aforementioned Amendment No. 1, is involved in this case. The claim is for $28,704, and arises out of a dispute between the parties as to the proper interpretation of certain specifications governing the hoods for animal housing equipment washers 1, 2, 3 and 4, and the tote box[2] washer. These specifications were drafted by defendant, and incorporated into the aforementioned Amendment No. 1 to describe the materials and work covered thereby.

Briefly stated, it is plaintiff's contention that the specifications, properly interpreted, call for the hoods of these washers to be manufactured of mild steel,[3] whereas it is defendant's interpretation of the same specifications that the hoods were to be of corrosion-resistant steel.[4] Corrosion-resistant steel is about eight times as expensive as mild steel.

When the specifications for furnishing and installing lab equipment were amended by defendant "in an effort to reduce costs," they were added as Amendments A through E to plaintiff's original specifications for the construction of the building. Amendment D covered the furnishing and installation of a broad array of washing machinery and equipment, including the five washers involved in this appeal. Section 4D of said Amendment D is entitled "MECHANICAL AND ELECTRICAL EQUIPMENT" and sets forth the applicable specifications for all mechanical and electrical equipment. Its introductory paragraph 4D–01 "GENERAL" provides:

a. This section of the specifications applies to and forms a part of sections covering the water conditioning equipment, laboratory glassware washing equipment, feeding bottle and jar washing equipment, animal housing equipment washers, incinerator charging equipment, conveyors, plumb-

---

[1]. Quoted from a decision of the Board of Contract Appeals of GSA, later detailed.

[2]. The tote box is used to "tote" certain glassware on its way to other glassware washers, where more specialized washing of the glassware takes place.

[3]. Also known as carbon steel.

[4]. Also known as stainless steel.

ing and steam piping, nonconducting covering, and electrical systems.

Paragraph 4D–22, still relatively general in its scope, provides as follows:

4D–22     CORROSION-RESISTING STEEL

a. *Where corrosion-resisting steel is referred to in the specification,* it shall be corrosion-resisting steel alloy, and shall comply with Federal Specification QQ–S–766c, and may be either Class 304, Class 316, Class 321 or Class 347, each Condition A (annealed), unless specified otherwise. *Corrosion-resisting steel shall be used on the interior of all machines and equipment for the interior side walls, framing and conveyors, and the like, which will operate as wetted surfaces.* Exposed surfaces shall be commercial mill Finish No. 3. [Emphasis supplied.]

Another general provision, paragraph 6D–01, "GENERAL," states:

a. This section of the specification applies to and forms a part of sections covering laboratory glassware washing equipment, feeding bottle and jar washing equipment, and animal housing equipment washers.

This is part of Section 6D of Amendment D of the specifications, entitled "WASHING EQUIPMENT, GENERAL REQUIREMENTS." Within this general section, paragraphs 6D–03 c. and d. provide:

c. Wash chamber hoods shall be not less than No. 14 gage.

d. *Tanks* shall be watertight and constructed of corrosion-resistant steel not less than No. 11 gage. [Emphasis supplied.]

Section 7D of Amendment D deals with Laboratory Glassware Washing Equipment, and paragraph 7D–12 specifically covers the tote box washer involved in this case. Section 9D of Amendment D deals with Animal Housing Equipment Washers, and paragraphs 9D–05 and 06 specifically cover the four animal housing equipment washers involved in this case. These directly applicable provisions do not specify whether the hoods are to be made of corrosion-resistant steel, or mild steel.

When the Government had earlier and abortively advertised for bids for furnishing and installing all the lab equipment under separate prime contracts as earlier described, these specifications directly applicable to the washers involved in this case had in fact expressly called for corrosion-resistant steel for the hoods of these washers. The Government was aware of this change in the language of the specifications when it negotiated Amendment No. 1 with plaintiff to add the furnishing and installation of lab equipment to plaintiff's building contract; but plaintiff was not aware of the contents of the prior aborted specifications, nor of the change.

Plaintiff solicited quotations from various manufacturers of equipment on the basis of the specifications furnished it by the Government, and two proposals were received covering, among other things, the washers involved in this case. The successful subcontractor, Ransohoff Company, interpreted the specifications as permitting the use of mild steel in the hoods of the washers, and its bid clearly indicates it is predicated on mild steel. The other proposal received (from Ramco, Inc.), was also based on furnishing mild steel, but was in the alternative: "(a) stainless steel for all wetted surfaces, and (b) stainless steel only where specifically called for."[5]

Subsequent to the acceptance of Ransohoff's proposal by plaintiff and execution of Amendment No. 1 to plaintiff's building contract by the parties, the contracting officer ruled that the interiors of the hoods for these washers were to be of corrosion-resistant steel, because they were "wetted surfaces" as referred to in general paragraph 4D–22, just above quoted. On appeal to the GSA Board of Contract Appeals pursuant to General Provision 6, "Disputes," of the

---

5.  Quoted from the board decision mentioned in note 1 *supra.*

contract,[6] that decision of the contracting officer was affirmed.

In this proceeding the parties acknowledge, as indeed they must, that essentially involved is an issue of law, namely, the interpretation of the pertinent provisions of Amendment No. 1 adding the equipment to plaintiff's contract.[7] The aforementioned "Disputes" provision refers only to "any dispute concerning a question of fact"; but even if it did provide, as does the current provision,[8] that incidental law questions may be considered, decisions thereon are not final,[9] and are eligible for *de novo* consideration here.

The respective arguments addressed to this conflict in interpretation are hereinafter briefly summarized. Plaintiff reminds us of the large variety of items called for by Amendment No. 1, and the relatively few involved in this case. Section 4D is therefore a very general section, and the above quoted paragraph 4D–22 is still relatively broad in scope, compared with these five items. That is why it forecasts other more specific provisions in its first sentence,

with the language "[w]here corrosion-resisting steel is referred to *in the specifications,* it shall be corrosion-resisting steel alloy * * *." It is further argued that the next sentence in the same paragraph, to the effect that corrosion-resisting steel "shall be used on the interior of all machines and equipment for the interior side walls, framing and conveyors, *and the like, which will operate as wetted surfaces*" is still general, since the first sentence would hardly be referring to the sentence immediately following with the words "[w]here * * * referred to *in the specifications.*" [Emphasis supplied.]

On the contrary, plaintiff urges, the reference to "in the specifications" is to the specific provisions elsewhere for these particular washers, as above quoted, which do not call out corrosion-resistant steel, although other specific provisions expressly do so where it is required. Plaintiff cites the fact that the Government had removed an initial specific requirement for corrosion-resistant steel for these washers when it abandoned efforts to buy the lab equipment

6. "DISPUTES

"Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Contractor. Within 30 days from the date of receipt of such copy, the Contractor may appeal by mailing or otherwise furnishing to the Contracting Officer a written appeal addressed to the head of the department, and the decision of the head of the department or his duly authorized representatives for the hearings of such appeals shall, unless determined by a court of competent jurisdiction to have been fraudulent, arbitrary, capricious, or so grossly erroneous as necessarily to imply bad faith, be final and conclusive: *Provided,* That, if no such appeal to the head of the department is taken, the decision of the Contracting Officer shall be final and conclusive. In connection with any appeal proceeding under this clause, the Contractor shall be afforded an opportunity to be heard and to offer

evidence in support of its appeal. Pending final decision of a dispute hereunder, the Contractor shall proceed diligently with the performance of the contract and in accordance with the Contracting Officer's decision."

7. Paccon, Inc. v. United States, 185 Ct. Cl. 24, 399 F.2d 162 (1968); Morrison-Knudsen Co. v. United States, 184 Ct. Cl. 661, 684, 397 F.2d 826, 840–841 (1968); W. G. Cornell Co. v. United States, 179 Ct.Cl. 651, 664–665, 376 F.2d 299, 308 (1967).

8. "(b) This 'Disputes' clause does not preclude consideration of law questions in connection with decisions provided for in paragraph (a) above: *Provided,* That nothing in this contract shall be construed as making final the decision of any administrative official, representative, or board on a question of law." Federal Procurement Regulations, 41 CFR § 1–7.101–12.

9. "No Government contract shall contain a provision making final on a question of law the decision of any administrative official, representative, or board." 41 U.S.C. § 322 (1964 ed.).

directly, and added it to plaintiff's contract by a negotiated amendment; that this change was "in an effort to reduce costs." Although plaintiff did not know of the modification in the specifications, it did know of the Government's desire to reduce costs, and it cites this change in the specifications for these washers as manifesting that the Government's intent when it drafted the specifications underlying Amendment No. 1 coincided with plaintiff's intent.

Furthermore, plaintiff observes that the general requirement for corrosion-resistant steel for "wetted surfaces" was not universal, and that requirements were governed by later specific provisions. For example, paragraph 8D–10, dealing with Feeding Bottle and Jar Washing Equipment states:

CONSTRUCTION of casing, tanks, inlet hoppers and all exposed metal which can be considered as a wetted surface shall be of corrosion-resisting steel as defined hereinbefore.[10]

In contrast, paragraph 6D–22 and 9D–05 expressly permit the use of mild steel for tank heating coils, and galvanized steel wire for conveyor screen components and pumps, although these are "wetted surfaces."

Plaintiff's chief witness before the GSA board testified that it was industry practice to construct wash chamber hoods for animal housing equipment washers and tote box washers out of mild steel where the specifications (as here) required a wash chamber hood of not less than 14 gage.[11] He explained that the compounds used to clean this type of equipment are alkaline detergents and the alkaline itself builds up a mild rust inhibiting coating on the steel, eliminating corrosion.[12]

In response to the foregoing the board of contract appeals, reading the above quoted provisions all together, concluded that "we cannot agree with Appellant's interpretation of the contract." The board observes (as plaintiff concedes), that since plaintiff and its supplier did not become "aware of the difference between the two sets of specifications" until the appeal to the board, they "did not know whether there were any differences" when the bid was prepared and submitted, and therefore are, the board continues:

* * * in no position to rely on these differences here but must be bound by a construction of the provisions of the second set of specifications in the absence of evidence in this record, and there is none, that Appellant was aware of the contents of the first set of specifications when it negotiated the amendment to the construction contract. Moreover, there is more than one method of requiring the use of a specific material in the construction of a machine. I [sic] can be accomplished by specifying the material to be used where the machine is specifically referred to in the specifications, the method used by the Government in the first set of specifications for the laboratory equipment, or by setting forth a general requirement for the type of material to be used and incorporating the requirement by reference by appropriate language into the section or paragraph of the specifications where the machine is referred to, the method used by the Government in the second set of specifications. Even assuming that Appellant itself was aware of the differences between the two sets of specifications for the laboratory equipment

10. *See also* 7D–08 "Station Type Glassware Washers."

11. Par. 6D–03d. reads: "Tanks shall be watertight and constructed of *corrosion-resistant* steel not less than No. 11 gage," which supports plaintiff's description of industry practice. [Emphasis supplied.]

12. At oral argument on these cross motions, it was explained by plaintiff's counsel that glassware washers, in contrast, use a different type of water and perform a more sophisticated type of cleaning, with the result that the custom in the trade is to provide corrosion-resistant (stainless) steel throughout.

when it negotiated the amendment to the construction contract, as indicated by our construction of the specifications upon which Ransohoff bid and the Appellant negotiated the said amendment, we find no such intention on the part of the Government as is attributed to it by the Appellant.

Answering plaintiff's argument that there was inconsistency in the treatment of steel requirements between the specific provisions above quoted, the board states:

* * * The answer to this alleged inconsistency lies in the testimony of Ransohoff's chief engineer that it was not normal practice for the tanks to be of stainless steel. Presumably, this was known to the person or persons who prepared Section D of the specifications and out of an abundance of caution it was specified that the tanks should be constructed of corrosion-resistant steel.

Consistent with plaintiff's contentions, the board opinion continues:

Appellant argues further that the intention that corrosion-resistant steel not be required in the construction of the hoods and tote box washer here involved is evidenced by the fact that such steel was required specifically for station type glassware washers in Paragraph 7D–08c and h, and for feeding bottle and jar washing equipment in Paragraph 8D–10, but was not called for in Paragraph 7D–12 relating to the tote box washer or in Paragraph 9D–05 and 9D–06, relating to the animal housing equipment washers. The reason for specifically requiring the use of corrosion-resistant steel for the station type glassware and feeding bottle and jar washing equipment also is in the testimony of Ransohoff's chief engineer. He testified that stainless steel hoods were required for glassware washers because there are solutions present which are corrosive to mild steel and also because the specifications contained performance requirements which necessitated the use of

corrosion-resistant steel to meet such requirements.

Plaintiff's argument alluding to industry practice is met as follows in the board opinion:

With respect to that portion of Appellant's argument relating to industry practice, we have said many times that where specifications are found to be unambiguous there is no need to resort to industry practice to determine the intentions of the parties. Although we admit that the specifications might have been drawn differently than they were, we find no ambiguity therein and, therefore, do not deem it necessary to resort to industry practice to determine the intentions of the parties.

Finally, the board opinion argues:

With respect to the point made concerning the bid submitted to Appellant by Ramco, Inc. [the unsuccessful supplier-bidder], the testimony of Appellant's project manager indicates that Ranco's [sic] bid was in the alternative; (a) stainless steel for all wetted surfaces, and (b) stainless steel only where specifically called for. Assuming that, as stated by Appellant's project manager, Ramco submitted its bid in this fashion because it thought Paragraph 4D–22 of the specifications was ambiguous, there is no evidence in this record that Appellant called the view of this bidder to the Government's attention when the amendment to the construction contract was negotiated or that the Government was otherwise aware of this view. Certainly, Appellant having been alerted to the matter, was obligated to call it to the Government's attention during the negotiations and having failed to do so, cannot now be permitted to rely upon the alleged ambiguity.

■ All of the arguments considered, it is concluded that the intrepretation plaintiff adopted in negotiating this Amendment No. 1 is the preferred and more reasonable interpretation. Whether or not plaintiff knew of the change in

these specifications by the Government prior to their submission to plaintiff, that fact is significant in demonstrating the Government's intent, particularly since the change was admittedly "in an effort to reduce costs." Since plaintiff's intent, gleaned from the same words, is in accord with the reasonably presumable intent of the Government, there is essentially no dispute between the parties on intent. And it is a cardinal rule of interpretation to seek the intention of the parties. United States v. Bethlehem Steel Co., 205 U.S. 105, 27 S.Ct. 450, 51 L.Ed. 731 (1907).

Defendant relies almost entirely on the relatively general second sentence of general paragraph 4D–22 above, as being the "specifications" referred to in the immediately preceding sentence which reads: "*Where* corrosion-resisting steel is referred to *in the specifications*, it shall be corrosion-resisting steel * * *." [Emphasis supplied.] More reasonable by far is plaintiff's interpretation that the "specifications" referred to in the first sentence means the specific provisions dealing directly with this equipment in later sections. The general pattern in the later specific provisions, above quoted, supports this result, as does the well known rule that *expressio unius est exclusio alterius*. It is significant that where corrosion-resisting steel is required, it is specifically called out in the later directly applicable provisions. If, as suggested in the board opinion, the above-cited inconsistencies are attributable to an "abundance of caution," it appears that this partial and indiscriminate exercise of caution has at least created an ambiguity.

Plaintiff's interpretation is, moreover, buttressed by uncontroverted trade practice.[13] That trade practice is *a fortiori* persuasive in this case, because it is offered here to underpin a preferred interpretation of the language employed by defendant; whereas in *Gholson*,[14] trade practice appears to have been employed to rebut language unambiguous "in its ordinary meaning."

But even assuming, *arguendo*, that the language employed by defendant is ambiguous, *i. e.*, susceptible to more than the one reasonable interpretation urged by plaintiff, plaintiff must prevail.[15] As stated by the court in *WPC Enterprises, Inc.*,[16] wherein the language employed by the draftsman was susceptible to more than one reasonable interpretation:

This is a study in the toils of ambiguity. The parties put their names to a contract which, on the point crucial to this lawsuit, could reasonably be read in two conflicting fashions. Each signatory seized in its own mind upon a different one of these contradictory versions. Compounding that confusion, they discussed the issue with each other in such a way that each thought, but this time without good reason, it had obtained the other's acquiescence in its chosen reading. The impasse became unmistakeably plain when it was too late. Our task is to determine on whom should fall the risk of such mutually reinforced obscurity.

* * * * * *

The plaintiff, on the other hand, emphasizes the lack of express mandatory language in the references to particu-

---

13. *See* Gholson, Byars & Holmes Constr. Co. v. United States, 173 Ct.Cl. 374, 395, 351 F.2d 987, 999 (1965).

14. Note 13 *supra*.

15. The rule of *contra preferentum*. United States v. Seckinger, 397 U.S. 203, 216, 90 S.Ct. 880, 25 L.Ed.2d 224 (1970); Gorn Corp. v. United States, 191 Ct.Cl. 560, 567, 424 F.2d 588, 592 (1970); Tecon Corp. v. United States, 188 Ct.Cl. 15, 411 F.2d 1262 (1969); D & L Constr.

Co. v. United States, 185 Ct.Cl. 736, 402 F.2d 990 (1968); Sundstrand Turbo v. United States, 182 Ct.Cl. 31, 389 F.2d 406 (1968); Southern Constr. Co. v. United States, 176 Ct.Cl. 1339, 1362, 364 F.2d 439, 453 (1966); WPC Enterprises, Inc. v. United States, 163 Ct.Cl. 1, 6, 323 F.2d 874, 876–877 (1963); and Peter Kiewit Sons' Co. v. United States, 109 Ct.Cl. 390 (1947).

16. Note 15 *supra* at 3, 5–6, 323 F.2d at 875–877.

lar manufacturers for the five disputed components—in contrast to certain other components which the specifications very plainly declared "shall be" or "shall consist of" an identified part made by a named manufacturer. A command to use only materials or elements made by a specific firm is not frequent in government procurement; it can be expected to be phrased explicitly and not left to inference. * * *

\* \* \* \* \* \*

* * * As with so many other agreements, there is something for each party and no ready answer can be drawn from the texts alone. Both plaintiff's and defendant's interpretations lie within the zone of reasonableness; neither appears to rest on an obvious error in drafting, a gross discrepancy, or an inadvertent but glaring gap; the arguments, rather, are quite closely in balance. It is precisely to this type of contract that this court has applied the rule that if some substantive provision of a government-drawn agreement is fairly susceptible of a certain construction and the contractor actually and reasonably so construes it, in the course of bidding or performance, that is the interpretation which will be adopted—unless the parties' intention is otherwise affirmatively revealed. Peter Kiewit Sons' Co. v. United States, 109 Ct.Cl. 390, 418 (1947); First-Citizens Bank & Trust Co. v. United States, 76 F.Supp. 250, 266, 110 Ct.Cl. 280, 310 (1948); Western Contracting Corp. v. United States, 144 Ct.Cl. 318, 326 (1958); W. H. Edwards Eng'r. Corp. v. United States, 161 Ct.Cl. 322, 331–332 (1963); Freedman v. United States, 162 Ct.Cl. 390, 400, 320 F.2d 359, 365 (1963). This rule is fair both to the drafters and to those who are required to accept or reject the contract as proffered, without haggling. * * *

Plaintiff in its brief relies most heavily on the court's decision in L. Rosenman Corp. v. United States, 182 Ct.Cl. 586, 390 F.2d 711 (1968), because of its similarity on the facts. It argues:

* * * In that case, the general specifications and a detail drawing required the installation of automatic valves throughout the building, but drawings of the floors showed a requirement for the automatic valves only for some floors and not for floors 8 through 15. Plaintiff concluded from the general specifications, detail drawing and the floor plans that where the floor plans showed the valves, they were to be installed and where they did not show the valves, the valves need not be installed. The Government contended that the omission in the drawings of floors 8 through 15 did not negate the clear direction of the specifications and the detail drawing to install valves throughout the whole building. Plaintiff's subcontractor had not included the cost of the valves in the price of the subcontract, and plaintiff had not called the matter to the attention of the Government. * * *

The court concluded at 590–592, 390 F.2d at 713–715:

* * * Plaintiff's temperature control sub-contractor, who had some expertise in the air-conditioning system of this specific building, did not consider the valves to be clearly required by the contract. It, too, believed the valves were clearly not required from the very beginning when it first submitted its bid to plaintiff. Nor do we think the contract specifications and detail drawings were so clear as to create a duty to seek clarification of the omission of the broken lines. Although the specifications and drawings may have been clear as a bell in the mind of defendant's architect, it is not the subjective intent that is the legal determinant. National Movers Co., Inc. v. United States, 386 F.2d 999, p. 1001–1002, 181 Ct.Cl. 419, p. 424–425 (1967). Rather, it is the representations of the specifications and drawings themselves which represent defendant's intent. And these were not so clear as to compel plaintiff to seek clarification, or as to make defendant's interpretation binding upon plaintiff. See, Tufano

Contracting Corp. and Anthony Grace & Sons, Inc., Joint Venture v. United States, 356 F.2d 535, 539, 174 Ct.Cl. 398, 405 (1966). "The Government, as the author [of the contract] has to shoulder the major task of seeing that within the zone of reasonableness the words of the agreement communicate the proper notions—as well as the main risk of a failure to carry that responsibility." WPC Enterprises, Inc. v. United States, 323 F.2d 874, 877, 163 Ct.Cl. 1, 6 (1963). Here defendant did not meet its burden. If it had wanted automatic radiator valves on all 15 floors, it should have said so explicitly. * * * [Footnotes omitted.]

*　*　*　*　*　*

The ultimate result of plaintiff's interpretation was also a reasonable one. Plaintiff concluded that the purpose of eliminating the valves for floors 8 through 15 was to effect a cost saving. This certainly is a reasonable interpretation. It also was not unreasonable in light of the entire contract since, even without the automatic valves on the disputed floors, the heating performance standards imposed by the specifications would be satisfied. The Government witness, Mr. Losordo, admitted on cross-examination that an adequate heating system had been provided by plaintiff. The fly in the ointment is that the Government just did not get what it had hoped it would get. But we think it got what the contract reasonably called for. That is

all that it is entitled to under these circumstances.

In the last analysis, defendant relies principally on plaintiff's alleged "duty to inquire," an argument partially answered in the above extensive quotation from *Rosenman*.[17] But there are additional reasons here why the "duty to inquire" concept is irrelevant on these facts. These were a relatively few pieces of equipment in an amendment to an *existing* contract, adding $6,303,104 in equipment, and a large volume of specifications. There was certainly presented no "major patent discrepancy, or obvious omission, or a drastic conflict in provisions"[18] in that context.

Moreover, the "duty to inquire" concept usually grows out of an explicit provision in an Invitation for Bids. Imposed later than that, it can serve no useful purpose. As stated in Beacon Constr. Co. v. United States, 161 Ct.Cl. 1, 6–7, 314 F.2d 501, 504 (1963):

> * * * The *invitation to bid* stated that requests for interpretation of the specifications and drawings could be made in writing to the Public Housing Administration, and that every interpretation made to a bidder would be issued as an addendum to the specifications and become part of the contract.[19] We do not reach or decide the question of whether the provisions of Article 2, quoted above, would have any effect on the contractor's rights if the ambiguity creating the issue of contract-

---

17. *See also* on this point, *WPC Enterprises, Inc.*, 163 Ct.Cl. at 6, 323 F.2d at 877:

"* * * Although the potential contractor may have some duty to inquire about a major patent discrepancy, or obvious omission, or a drastic conflict in provisions (see Consolidated Eng'r. Co. v. United States, 98 Ct.Cl. 256, 280 (1943); Ring Constr. Corp. v. United States, 162 F.Supp. 190, 192, 142 Ct.Cl. 731, 734 (1958); Jefferson Constr. Co. v. United States, 151 Ct.Cl. 75, 89–91 (1960)), he is not normally required (absent a clear warning in the contract) to seek clarification of any and all ambiguities, doubts, or possible differences in interpretation. The Government, as

the author, has to shoulder the major task of seeing that within the zone of reasonableness the words of the agreement communicate the proper notions— as well as the main risk of a failure to carry that responsibility. If the defendant chafes under the continued application of this check, it can obtain a looser rein by a more meticulous writing of its contracts and especially of the specifications."

18. *See* preceding footnote.

19. This is essential if all potential bidders are to be equally informed, and equally treated; and if the inquiring bidder is not to be penalized for his zeal.

interpretation first appeared, or the problem arose, after the contract was signed. In this case it is plain that, as we have found, the discrepancy was in actual fact, and in reason must have been, fully known to plaintiff before it computed its bid. It had ample cause and opportunity to seek an interpretation from the Government before consummating the agreement, but it did not do so, electing to rest on its own private reading. *A prime purpose of these contractual provisions relating to ambiguities and discrepancies is to enable potential contractors (as well as the Government) to clarify the contract's meaning before the die is cast.* The bidder who is on notice of an incipient problem, but neglects to solve it as he is directed to do by this form of contractual preventive-hygiene, *cannot rely on the principle that ambiguities in contracts written by the Government are held against the drafter* (*e. g.,* Peter Kiewit Sons' Co. v. United States, 109 Ct.Cl. 390, 418 (1947)). \* \* \* If the bidder fails to resort to the remedy proffered by the Government, a patent and glaring discrepancy (like that which existed here) should be taken against him in interpreting the contract. We do not mean to rule that, under such contract provisions, the contractor must at his peril remove any possible ambiguity prior to bidding; what we do hold is that, when he is presented with an obvious omission, inconsistency, or discrepancy of significance, he must consult the Government's representatives if he intends to bridge the crevasse in his own favor. Having failed to take that route, plain-

tiff is now barred from recovering on this demand. [Footnotes omitted; emphasis supplied.]

In this case, there was no Invitation for Bids. There is no incentive to seek unfair advantage over competing bidders. This was an amendment to an existing contract, negotiated between the two parties, on specifications drafted and revised by one of the parties "in an effort to reduce costs," a motive probably known to the other party from the mere fact that its contract was being amended. The sole incentive here on both parties was to avoid ambiguity. It is questionable that plaintiff's reading of the contract as a whole even suggested an ambiguity to it.[20] There is not here the ordinary need, as expressed in a typical Invitation for Bids "to clarify the contract's meaning [for other potential contractors] before the die is cast."[21] The penalty imposed on a bidder confronted with a "patent and glaring" ambiguity who remains silent, and later becomes the contractor, is that he then "cannot rely on the principle that ambiguities in contracts written by the Government are held against the drafter \* \* \*."[22]

This, in contrast, was a "one on one" negotiation of price where the contractor must simply be advised by the draftsman in clear language what is expected of him.[23] As earlier stated, plaintiff's interpretation of the specifications is objectively the preferred one; it is supported by trade practice; no ambiguity in fact appeared that was not "readily resolved by a reading of the contract as a whole." If deemed ambiguous, *arguendo*, the ambiguity was not "patent and glaring" in the context of this large amend-

20. *See* note 4, *Beacon*, 161 Ct.Cl. at 7, 314 F.2d at 504.

21. *Beacon*, as quoted in the text.

22. *Id.*

23. There is little reason to doubt, in this instance, that, if plaintiff had asked for clarification and had been told that corrosion-resistant steel was required, plaintiff would have increased its price to make up for that more expensive requirement and the defendant would then

probably have agreed to the increase.

Moreover, it is very uncertain on this record that the alternative bid from plaintiff's potential subcontractor (Ramco), on which defendant relies to show that plaintiff was in fact alerted to the ambiguity in the contract documents, did alert or reasonably should have alerted plaintiff. Ramco's bid is consistent with the view that the contract permitted either mild steel or corrosion-resistant steel for the items involved here. [Footnote by the court.]

ment, and plaintiff is clearly entitled to the benefit of the *contra preferentum* rule.[24]

Plaintiff's motion for summary judgment is granted and defendant's cross-motion is denied. Further proceedings are stayed pursuant to Rule 167 for a period of ninety (90) days to afford the parties an opportunity to obtain an agency resolution of the equitable adjustment in contract price to which plaintiff is entitled.

---

59 CCPA

24. Sturm v. United States, 190 Ct.Cl. 691, 421 F.2d 723 (1970).