Julius **PETROFSKY**, d/b/a Petrof
Trading Company

v.

The **UNITED STATES.**

No. 840–71.

United States Court of Claims.

Dec. 19, 1973.

**1396**

Robert Sheriffs Moss, Washington, D. C., atty. of record, for plaintiff.

Steven J. Bercik, Elizabeth, N. J., with whom was Acting Asst. Atty. Gen., Irving Jaffe, for defendant.

Before DAVIS, KASHIWA and KUNZIG, Judges.

## ON PLAINTIFF'S AND DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT

PER CURIAM:

This case comes before the court on the parties' request for review by the court of the recommended decision, filed March 23, 1973, by Trial Judge Hal D. Cooper pursuant to Rules 166(c) and 54(b). The court has considered the case on the briefs and oral argument of counsel.

■ On the issue of the loading-charge refund, the court stresses, perhaps somewhat more than the trial judge did in his opinion, that the plaintiff should have been aware, from the time he received the invitation for bids for the contract in suit, that at the best (from his viewpoint) there was a very serious question whether the loading charge was to be assessed on a gross-weight or a net-weight basis. In the circumstances—including the various terms of the contract, the size of the loading charge, and the disparity between the price to be bid per unit of gunpowder and the loading charge—it was not reasonable to assume silently, without making any inquiry at all, that the loading charge would be imposed on the net-weight basis. This was clearly a case in which, from the contractor's standpoint, a pre-bid inquiry was mandated if he wished to have the issue resolved in his favor. See Space Corp. v. United States, 470 F.2d 536, 539, 200 Ct.Cl. 1, 5 (1972); Merando, Inc. v. United States, 475 F.2d 598, 201 Ct.Cl. 19 (1973).

Since the court agrees with the recommended decision of the trial judge, as hereinafter set forth, it hereby affirms and adopts the same, together with the above, as the basis for its judgment in this case. Therefore, plaintiff's motion for summary judgment under Count I is granted, and defendant's cross-motion is denied, for the purchase price refund in the stipulated sum of $570.18. Plaintiff's motion for summary judgment with respect to the loading-charge refund is denied and defendant's cross-motion is granted with the petition dismissed as to it. Defendant's motion for partial summary judgment as to Counts II and III is denied and the case is remanded to the trial judge for trial on those two counts.

### Opinion of Trial Judge

COOPER, Trial Judge:

This case arises out of a contract dated August 19, 1960, for the sale to plaintiff of 53,537,460 pounds of smokeless gunpowder at prices ranging from $0.00001 to $0.001 per pound of powder for a total contract price of $2,318.70. Due to the hazardous nature of the materials, located at several different Naval Ammunition Depots (NAD), the contract made it "mandatory that loading be performed by the Government for the account of the purchaser." The parties negotiated a schedule for the removal of the powder from each ammunition depot and under the terms of the contract, plaintiff agreed to pay the various holding activities, in advance, a fixed loading charge for their services.

Plaintiff removed 49,546,467 pounds of powder during the contract period of performance which expired on August 19, 1962. Since plaintiff paid for 3,990,993 pounds of powder he did not receive, defendant computed and refunded a portion of the purchase price. In addition, certain advance deposits that

had been credited toward loading charges were also refunded. Plaintiff challenged the Government's computation of both these figures and asserted that he was entitled to further refunds under the terms of the contract. His request for an additional refund was denied by the contracting officer and a timely appeal was filed with the Armed Services Board of Contract Appeals (hereinafter ASBCA or Board).

In Count I of the petition herein, plaintiff seeks review under Wunderlich Act standards[1] of the decision of the ASBCA[2] which sustained the actions of the contracting officer and denied plaintiff's claims for further refunds of the purchase price and loading charges in the amounts of $570.18 and $66,525.69, respectively.[3] In Count II of the original petition and Count III of the amended petition, plaintiff sues to recover the sums of $250,000 and $300,000, respectively, as damages suffered as a result of defendant's alleged breach of its contractual obligations.[4]

In its answer and by cross-motion for partial summary judgment, defendant asks the court to sustain the administrative decision at issue in Count I and to rule in its favor on any of several affirmative defenses which would in effect result in the dismissal of most of the claims set forth in Counts II and III.

It is concluded, for the reasons set forth below, that plaintiff's motion for summary judgment under Count I should be granted for the purchase-price refund but denied with respect to the loading-charge refund and that defendant's motion for summary judgment on Counts II and III should be denied.

The history of this controversy is set out in detail in the Board's decision and only the pertinent facts need be summa-

rized here before proceeding to a consideration of the merits of the motions.

In January 1960, the U.S. Naval Weapons Plant, Supply Department, Washington, D.C., advertised the sale of 112,000,000 pounds of smokeless gunpowder stored in several ammunition depots throughout the United States. In response, plaintiff, who was engaged in the business of purchasing Government surplus property, submitted a bid at prices ranging from $0.00001 to $0.001 per pound of powder. The defendant rejected most of the bids, apparently for the reason that the minute prices were too low to cover the Government's cost of handling and loading the materials. As a result, only 10,500,000 pounds of the powder were sold, none of which was awarded to plaintiff.

On March 4, 1960, the Government published a Request for Quotations (RFQ) on 99,774,940 pounds of powder. Plaintiff again submitted a bid but, again, the bids submitted by plaintiff, and other contractors, were insufficient to cover the Government's handling costs and only 1,100,000 pounds of powder were sold, none to plaintiff.

In late April and early May 1960, plaintiff attempted to negotiate a contract with the defendant in Washington, D.C., by raising his prices slightly during several negotiating sessions. These efforts, however, proved to be unsuccessful.

Finally, the contracting officer informed plaintiff that the Government wanted to include a separate provision in the contract to cover its loading costs because previous awards with minute quotations were lower than it was costing the Government to load the materials. Eventually, the contracting officer obtained estimates of loading costs from the various depots and determined a

---

1. 68 Stat. 81, 41 U.S.C. §§ 321–322 (1964).

2. ASBCA No. 11863, 70–1 BCA ¶ 8272. On Motion for Reconsideration, 71–2 BCA ¶ 9074.

3. The parties entered into a posthearing stipulation (February 11, 1970), wherein the

amount of each refund due plaintiff was agreed upon if the Board decided in plaintiff's favor.

4. Plaintiff's motion for a trial de novo on these two counts has been granted.

fixed loading charge for handling the powder.

On May 31, 1960, defendant issued Sales Invitation No. B–80–60–171 (IFB) for the sale of 95,910,630 pounds of powder.

Item 1 of the IFB listed the powder for sale by caliber, type, location, and net pounds available in individual lots numbered (1) to (95). Item 2 solicited an aggregate bid for the whole quantity of powder.

On or about June 24, 1960, plaintiff submitted a bid for 53,537,460 pounds of the powder, in containers, at prices ranging from $0.00001 to $0.001 per pound of powder, for a total contract price of $2,318.70. On August 18, 1960, plaintiff attended a conference with the contracting officer and other officials in Washington, D.C., for the express purpose of negotiating a schedule for removal of the powder from the various depots, and assuring defendant that plaintiff was capable of complying with the terms and conditions of the contract. Plaintiff's bid was accepted and Contract No. N–171–21478A was awarded on August 19, 1960. On or about this same date, plaintiff paid the full purchase price of $2,318.70.

Under the terms of the contract, plaintiff agreed, *inter alia*, to remove the purchased powder from all of the specified depots within a 12-month period (August 19, 1960 to August 19, 1961), except for Hastings, where a second-year period was provided (August 19, 1961 to August 19, 1962). Later the 1-year period was extended from August 19, 1961 to May 18, 1962, by several contract amendments.

Plaintiff proceeded to remove powder from the depots until May 18, 1962. At that time, defendant terminated the contract with respect to gunpowder remaining at all of the depots except Hastings. The contract was terminated with respect to gunpowder remaining at Hastings on August 19, 1962. Upon termination, plaintiff had removed a total of 49,546,467 pounds of powder, leaving some 3,990,993 pounds of powder for which plaintiff had paid but had not received.

With this historical background, the merits of the parties' respective contentions under Count I will first be considered, followed by a consideration of the motion for summary judgment as to Counts II and III.

### Loading-Charge Refund

The parties are in agreement that plaintiff was to pay defendant a fixed charge for loading the powder, pursuant to ¶ 21 of the contract, which reads in its entirety:

21. LOADING. Due to the inherently dangerous nature of the Smokeless Powder, it is mandatory that loading be performed by the Government for the account of the purchaser. The Government agrees to load on board carrier at location of material in carload or truckload lots and in one operation only unless the material sold hereunder is ordinarily shipped in less than carload lots. In the latter case the Government agrees to load on board carrier as the Purchaser's shipping orders may direct. If the Purchaser's shipping orders do not specify the freight classification or if the freight classification is incorrect, the Government is authorized to select the appropriate freight classification to carry out the Purchaser's shipping orders. *The cost to load will be $.0036 per pound.* Loading charges will be paid by the Purchaser directly to the Holding Activity in advance. Payment will be cash, certified check, cashier's check, or money order payable to the Treasurer of the United States. The Purchaser and the holding activity will arrange an acceptable loading schedule.

The issue presented is whether the loading charge of "$.0036 per pound" was to be assessed, as defendant contends, on a gross-weight basis, *i.e.*, weight of powder plus weight of container, or, as plaintiff argues, on a net-

weight basis, *i.e.*, weight of powder only.[5] Since this issue involves the interpretation of contractual provisions, it is basically a question of law on which the court may independently reach its own conclusion. J. W. Bateson Co. v. United States, 450 F.2d 896, 196 Ct.Cl. 531 (1971); Jamsar, Inc. v. United States, 442 F.2d 930, 194 Ct.Cl. 819 (1971).

■ In resolving this issue, it is fundamental that the provisions of a contract are to be so construed as to effectuate the spirit and purpose of the contract. Global Van Lines, Inc. v. United States, 177 Ct.Cl. 829, 836 (1966). Here, the purpose of the loading charge was well understood by both parties. As plaintiff testified:

He [the contracting officer] told me that the Government was interested in recovering what they figured it cost them to load out the powder, at least to recover that. He said they wanted to at least recover the amount of money that it cost them to load the stuff out. This is the way I interpreted it. This is the way I understood it.

■ Given then this mutually understood purpose of the loading charge, the question is what was plaintiff to pay for at the specified rate of "$.0036 per pound"? The answer, in simple terms, would appear to be that he was to pay at that rate for, and defendant could reasonably expect to be paid at that rate for, each and every pound loaded on board plaintiff's carriers. Since, by specifying a "per pound" charge, the parties plainly intended the charge to be dependent on the weight of the goods physically loaded on board plaintiff's carriers and, since the weight defendant was obliged to load consisted of both the powder and the containers in which the powder was stored, the "per pound" charge, would seem to apply to both. Most certainly, there is nothing in ¶ 21 that would limit the per-pound charge only to the weight of the powder.

Nor is there anything in any other of the provisions that would suggest the loading charge was to apply only to the weight of the powder. In fact, the contract language repeatedly couples the powder with the containers. For example, the heading to Item 1 in the IFB reads:

Item 1. Bid for any quantity of smokeless powder (*in containers*) listed and described below. Bidder will indicate on following lines, exact quantity desired and amount of his bid; [Emphasis added.]

Immediately following the 95 lots of powder for sale, there appear instructions which read in pertinent part:

Item 1 (continued). Bid shall be made for any or all of the smokeless powder (*in containers*) listed in Item 1(1) to (95). * * * [Emphasis added.]

On the same page as the above, Item 2 states:

Item 2. *Alternate Bid.* This item consists of all smokeless powder (*in containers*) listed and described in Item 1(1) to (95) inclusive. * * * [Textual emphasis added.]

Under the heading ADDITIONAL INFORMATION, the weight of powder *and* containers, and the type of packing, were listed separately for each depot, as for example:

NAD HASTINGS, *Nebraska*:

1,000,000 lbs. are packed in wooden boxes, zinc lined net weight 150 lbs. each, gross 193 lbs. ea.

29,677,800 lbs. are packed in SP MK. 7 metal boxes, net weight 110 lbs. each, gross 148 lbs. ea.

10,000 lbs. are packed in 8"/55 MI 10–0 tanks, net weight 60 lbs. each, gross 92 lbs. ea.

And, on page 14, the contract expressly provides that:

No deduction will be made for the weight of containers. This property is offered for sale in containers,

---

5. The parties have stipulated that on plaintiff's net-weight theory, plaintiff would be entitled to a loading-charge refund of $66,525.69.

weight of material to include weight of containers.

\* \* \* \* \* \*

Plaintiff argues that the loading provision (¶ 21) does not refer to the quoted clause on page 14 of the contract and that the terms and location of that clause indicate that it is not applicable to the loading charge.

■ However, it is settled that "[a] contract must be considered as a whole and interpreted so as to harmonize and give meaning to all of its provisions." Victory Carriers, Inc. v. United States, 467 F.2d 1334, 199 Ct.Cl. 410 (1972). As this court stated in Hol-Gar Mfg. Corp. v. United States, 351 F.2d 972, 979, 169 Ct.Cl. 384, 395–396 (1965), "an interpretation which gives a reasonable meaning to all parts of an instrument will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless or superfluous." Plaintiff's attempt to isolate ¶ 21 from the other provisions of the contract is inconsistent with these settled principles.

Plaintiff further contends that since the loading charge does not specify net or gross weight of material, his interpretation of the contract as calling for loading charges on a net-weight basis was reasonable. In support of this contention, it is argued that all references in the contract to the word "pounds" denotes a net weight of material and this, together with the fact he was bidding for powder on a net-weight basis, made it reasonable to assume the loading charge would be assessed on a net-weight basis as well.

However, all references in the contract to the word "pounds" did not denote net weight of material for, as previously indicated, the weight of the containers and the gross weight of the powder were also set forth. Nor does the net-weight basis on which bids were submitted provide support for plaintiff's position. The sale of goods and the loading of goods are two entirely different functions. As to the former, the sale price represents remuneration to the owner for the goods themselves while, as to the latter, the loading charge represents remuneration for the physical act of loading the goods, cf. The Bill, 55 F.Supp. 780, 783 (D.Md.), aff'd per curiam, Lorentzen v. Brazil Oiticica, Inc., 145 F.2d 470 (4th Cir. 1944).

As plaintiff well knew, the loading charge was a special charge based on considerations wholly independent of the sale price of the powder. As to the sale of the powder, the Government was willing to, and in fact did, sell at prices substantially below its actual cost. But, as to the loading cost, the Government insisted, as a precondition of sale, on recovery of those costs. To assume that the same net-weight basis would apply both to sale price and loading costs, despite the very different nature of the two and the very different considerations involved, was unreasonable.

Indeed, it would seem obvious, as a matter of common experience, that any charge, be it for hauling or loading assessed on a "per pound" basis, would apply to the gross weight of the goods to be hauled or loaded. Where the goods are stored in containers, and both the goods and the containers are to be hauled or loaded, it seems equally obvious that, in the absence of express language to the contrary, the per-pound charge would be levied on the combined weight of the goods and the containers.

It is also worthy of note that, in the IFB, the following notation appears on 12 separate pages:

ATTENTION IS INVITED TO THE CHARGE FOR GOVERNMENT LOADING. SEE PARAGRAPH 21 ON PAGE 4 OF THE INVITATION.

Notwithstanding these notable references, and in the face of a loading charge which, according to plaintiff's testimony, he considered to be "inordinately high," plaintiff never inquired, prior to award, either as to the basis for the $0.0036 figure or whether it would be levied on the gross or net weight of the powder.

■ Having adopted, without inquiry, an interpretation that, under the circumstances here present, was not a reasonable one, there is no basis for invoking the *contra proferentem* rule urged by plaintiff. Bishop Eng'r Co. v. United States, 180 Ct.Cl. 411, 416 (1967); Jamsar, Inc. v. United States, 442 F.2d 930, 194 Ct.Cl. 819 (1971).

Finally, plaintiff's brief enumerates several factual findings by the Board that plaintiff contends are erroneous or unsupported by substantial evidence. After reviewing the entire record and each contention of plaintiff, it is concluded that it is unnecessary to discuss each and every one of these findings. There are sufficient undisputed findings of fact, together with the contract itself, to support the result reached by the Board.

Plaintiff's motion, insofar as it seeks a loading-charge refund, is denied and defendant's motion is granted.

### Sales Price Refund

Plaintiff also asserts under Count I that defendant incorrectly computed a refund of the purchase price for powder he had paid for but did not receive.

In particular, it is contended that the powder was purchased on a netweight basis and that, in computing the refund, the net weight of powder delivered should be deducted from the net weight of the power purchased. Defendant, on the other hand, argues that plaintiff agreed to purchase the powder on a gross-weight basis and that the refund was correctly calculated by subtracting the gross weight of powder delivered from the net weight bid upon and applying the unit price to the difference.

Since this issue also involves the interpretation of contract language—a question of law—the court is not bound by the Board's legal determinations but may independently examine the provisions in dispute and reach its own conclusion.

There is no dispute that defendant's objective in putting the powder up for sale was to dispose of the entire 95 lots of powder. Nor is there any dispute that the 95 lots itemized in the IFB listed the powder at its net weight. The record further establishes that both parties understood that the bids submitted were on a net-weight basis.

Under ¶ 19 of the section entitled "Additional Provisions," the contract required that the successful bidder pay the full purchase price in advance of removal of the powder. In awarding the contract to plaintiff, defendant, in a letter dated August 19, 1960, listed the "[t]otal price of material" at $2,318.70. This figure represented plaintiff's bid on a net-weight basis. As required by ¶ 19, plaintiff paid this full amount in advance and defendant stamped the award letter "Paid."

■ From this brief recitation of undisputed facts, it is apparent that the net weight of the powder formed the basis on which bids were solicited and on which bids were submitted, as well as the basis on which plaintiff's bid was accepted. It also formed the basis on which advance payment of the "full purchase price" (¶ 19) was accepted by defendant.

Paragraph 20 of the contract specified how refunds were to be computed. That provision reads, in pertinent part:

> * * * In the event of a shortage the Government will refund to the Purchaser the difference between the quantity paid for and the quantity delivered, calculated upon the basis of the unit prices set forth in this contract.

Since both the "quantity paid for," as represented by defendant's acceptance of the full purchase price, and the "unit prices" bid were on a net-weight basis, it would seem logical that the "quantity delivered" should be computed on the same basis of measurement.

■ Both the Board and defendant rely heavily on the previously quoted clause on page 14 of the contract to support the contention that the sale of powder was on a gross-weight basis. How-

ever, that interpretation is plainly inconsistent with defendant's acceptance of plaintiff's payment of $2,318.70 as the "full purchase price" for 53,537,460 pounds (net) of powder. This contemporaneous construction of the contract, before it became the subject of dispute, is entitled to great weight. Pacific Far East Line, Inc. v. United States, 394 F. 2d 990, 184 Ct.Cl. 169 (1968).

Moreover, defendant's present interpretation of the contract is inconsistent with its objective in placing the powder for sale. This objective was to dispose of a certain quantity of unwanted powder.[6] By soliciting and accepting bids on a net-weight basis, defendant committed all of the powder itemized in the contract. Yet, if deliveries to purchasers were to be credited, as defendant now contends, on a gross-weight basis, this would mean that no purchaser would receive the quantity of powder for which he bid and paid, and defendant would be left with substantial quantities of unwanted powder.

In fact, consistent with the objective of the contract, the statement on page 14 that "[n]o deduction will be made for the weight of containers" suggests that the weight of the containers could not be used as a basis for reducing the amount of powder the successful bidder was obligated to remove.

It is concluded that the refund should have been computed on a net-weight basis, consistent with the basis on which the bids were solicited and accepted. Accordingly, plaintiff's motion, to the extent it seeks a purchase-price refund, is granted, defendant's motion is denied, and plaintiff is entitled to recover the stipulated amount of $570.18.

### Breach of Contract Claims

Counts II and III of the original and amended petitions, respectively, allege breach of contract claims for damages suffered as a result of defendant's activities, or lack thereof. In Count II, plaintiff contends that his failure to remove all the purchased powder from the depots within the time specified in the contract was without his fault or negligence but was directly attributable to the actions of the various depots. Such actions, plaintiff says, include, but are not limited to, delaying the loading of powder, granting loading preferences to other depots, and actively interfering with the removal operations. Thus, it is asserted that defendant breached its contractual obligations, thereby denying plaintiff the resale value and profits of the undelivered powder in the amount of $250,000.

Count III, framed as an alternative to Count II, alleges defendant failed either to place the unremoved gunpowder in storage or to sell it for plaintiff's account, contrary to the requirements of ¶ 7 of the contract, thereby breaching the contract and denying plaintiff the resale value and profits of the undelivered powder in the amount of $300,000.

Defendant has asserted defenses of estoppel, waiver, and accord and satisfaction as to Counts II and III and has moved for partial summary judgment as to those defenses.[7]

Plaintiff's contract called for the removal of powder from all depots except Hastings within 1 year of August 19, 1960, the date of award. By amendment to the contract dated September 20, 1961, as revised November 17, 1961, plaintiff was granted an extension of 180 days for the removal of powder from all depots except Hastings. This extended the removal deadline to February 18, 1962, and established storage charges as authorized by ¶ 7 of the contract.

---

6. The record indicates that the powder had deteriorated to an unstable condition and it was for this reason that the Government sought, by sale, to dispose of the powder.

7. Defendant excludes from its motion the claim under Count II relating to the ammunition depot at Hastings, Nebraska. Although no formal motion has been filed with respect to Count III, defendant's answer to that count incorporates by reference the motion as to Count II and the motion will be treated as extending to both counts.

By letter of February 7, 1962, plaintiff requested a second extension of time, from February 18, 1962 to May 18, 1962, with respect to all depots except Hastings. This letter described the Government's alleged interference with his orderly removal of powder and then stated as follows:

The Petrof Trading Company will give up all right and claim to any property not removed by the May 18 closing date without consideration for shortages or overages; packing shortages; discrepencies [*sic*] in nomenclature presently known; packing containers etc. It is understood that property removal from other installations will not change the present final property removal date of Aug. 18, 1962 from NAD, Hastings, Nebraska. All catalogue quantities overages at NAD, Crane, Indiana are to be included as previously authorized. Rail cars are expected to be loaded to full capacity.

If the foregoing request is favorably acted upon and the orderly removal of the property is not seriously impaired by conditions beyond Petrof Trading Co., control, the Petrof Trading Co. agrees to request no further extensions, quantity adjustments or other considerations in the administration or completion of subject contract.

On February 16, 1962, the contracting officer, in a letter addressed to three contractors including plaintiff, extended the expiration date to May 18, 1962. Since defendant places heavy reliance upon this correspondence in support of its affirmative defenses, the entirety of the letter is set forth:

1. Consultation of Defense Supply Agency, Bureau of Naval Weapons Representatives, the Contracting Officer and certain contractors have recently been held in order to evaluate contractor(s) performance and Government caused problems in property removal under subject contracts. It has been decided to approve contractor(s) requests for an additional (second) extension for removal of residual quantities of Smokeless Powder included in these contracts. The new contract expiration date for property removal is Friday, 18 May 1962.

2. In consideration for this extension, the contractors have agreed to waive all other claims, other property removal date extensions or special considerations by the holding activities in completion of property removal.

3. For those contracts which expired prior to 18 February 1962, there will be no storage charges assigned for Smokeless Powder retained in Government Magazines between the adjusted expiration date and 18 February. Storage charges will be assigned for property retained between 18 February and removal date.

4. The cooperation of contractors and holding activities in expediting the "clean up phase" of these contracts is earnestly solicited.

On May 18, 1962, the contract was terminated as to the remaining unremoved powder.

■ Defendant first contends that plaintiff is barred from asserting the claim set out in Count II by the doctrine of equitable estoppel. Emphasizing plaintiff's request for an extension of time in his letter of February 7, 1962, and his statement that he "will give up all right and claim to any property not removed by the May 18 closing date without consideration for shortages * * *," defendant argues that, in reliance on this statement, the Government changed its position by agreeing to the amendment extending the contract expiration date and that plaintiff accepted the benefits of such an extension. This, defendant argues, should equitably estop plaintiff from presenting a claim for any shortage in the amount of powder received under the contract.

A close examination of the precise language of plaintiff's February 7, 1962 letter reveals that plaintiff's statement that he will give up certain rights and claims is not an unequivocal, uncondi-

tional or unqualified declaration without any suggestion of reservation. The entire tone of the February 7 letter, read as a whole, appears to condition plaintiff's statement in terms of future obligations on the part of the Government. In the beginning of the letter, plaintiff sets forth the alleged interfering activities of defendant which he says necessitated the request for a second extension. In the final paragraph, he speaks in terms of no additional requests if plaintiff's removal of the property "is not seriously impaired by conditions beyond [his] control."

The only fair and sensible reading of the correspondence is that plaintiff agreed "to waive all other claims * * *" for unremoved powder in consideration for the second extension, provided his removal activities were not seriously impaired by the actions of the depots.

Neither party has pointed to any evidence, either in the administrative record or by affidavit, that would indicate whether the removal operations during the extended period were hampered by actions of the depots, although plaintiff does allege that they were.

■ The doctrine of equitable estoppel is founded on morality and justice with "conscience and equity its concern." Harvey Radio Labs., Inc. v. United States, 115 F.Supp. 444, 449, 126 Ct.Cl. 383, 391 (1953), cert. denied, 346 U.S. 937, 74 S.Ct. 377, 98 L.Ed. 425 (1954). Here, unresolved issues of fact preclude a finding that either good conscience or concepts of fair dealing require invoking an estoppel against plaintiff. It is an implied condition of every contract that "neither party to the contract will do anything to prevent performance thereof by the other party or that will hinder or delay him in its performance." Wah Chang Corp. v. United States, 282 F.2d 728, 733–734, 151 Ct.Cl. 41, 49 (1960). It is simply unknown whether, in fact, defendant did breach its implied obligation by interfering with plaintiff's orderly removal of powder during the extended removal period. If it did, and this can only be determined at trial, there would be no basis for an estoppel.

■ Moreover, it is the usual rule that the acts, conduct or declaration of the party estopped must be such as to lead the other party in reliance thereon, to change his position to his detriment. Mahoning Inv. Co. v. United States, 3 F.Supp. 622, 629–630, 78 Ct.Cl. 231, 246–247 (1933), cert. denied, 291 U.S. 675, 54 S.Ct. 526, 78 L.Ed. 1064 (1934). Detrimental reliance is an essential element of the estoppel. Williamsburg Drapery Co. v. United States, 369 F.2d 729, 736, 177 Ct.Cl. 776, 789 (1966). The change of position here asserted by defendant is the grant of the extended removal period; however, it is not clear from the present record that this constituted any detriment to defendant.

Alternatively, defendant argues that plaintiff's acceptance of the modification of the contract closing date constituted a waiver of whatever claims plaintiff might have had at the time the extension was granted. However, any waiver contained in the letter of February 7, 1962, was, at best, a conditional one. Whether the condition precedent to the promise to "give up all right and claim" to unremoved powder was in fact fulfilled is an unresolved issue of fact which precludes the grant of summary judgment.

■ Defendant further argues that it "might also be possible to view this transaction as an accord and satisfaction." However, this is not a case where the parties have completed performance of a contract and, after negotiations, executed a release of "all claims of any kind or description under or by virtue of" the contract, United States v. Wm. Cramp & Sons, 206 U.S. 118, 127–128, 27 S.Ct. 676, 678, 51 L.Ed. 983, (1907); nor is this a situation where the parties have bargained at length for additional compensation in satisfaction of all outstanding claims. Brock & Blevins Co. v. United States, 343 F.2d 951, 170 Ct.Cl. 52 (1965). At most, the contract amendment, to the extent it can

be viewed as an accord, was partially executory, depending in part for its completion on the future, unimpaired, orderly removal of the powder. Whether such removal was orderly and unimpaired remains to be determined at a trial.

 Finally, defendant also asserts that plaintiff's acceptance of a refund of a portion of the purchase price, together with the stipulation of the parties regarding the amount of the refund if plaintiff's net-weight theory is sustained, now estops plaintiff from asserting Count III and, moreover, comprises an accord and satisfaction with respect to all claims.

Neither defense can be sustained. The stipulation, and the portion of the refund accepted by plaintiff, relate only to the amount of money due plaintiff as an adjustment for the variation in quantity delivered under ¶ 20 of the contract. Neither was intended to compensate plaintiff for alleged breach of contract. Nor is there anything in the terms of the stipulation that could be construed as a release of plaintiff's claim for damages.

 It is, of course, apparent that plaintiff's claim for return of a portion of the purchase price is in the nature of a claim for restitution and it is generally the rule that restitution and a suit for damages are alternative remedies. Restatement of Contracts, § 384 (1932); 5A A. Corbin on Contracts § 1217 (1964). However, neither principles of election of remedies nor discharge by merger should preclude plaintiff from proceeding with his claim for damages in the circumstances of this case. The claim for a refund was one that plaintiff had to pursue administra-

tively, while the claim for damages for breach is one that could not have been pursued in that forum. Had the forum been the same for both claims, plaintiff could have pleaded both claims simultaneously but alternatively. There is no reason to place plaintiff under a greater handicap simply because of the bifurcated nature of the procedures under which those contracting with the Government must seek relief when both a disputes claim and a breach claim arise from the same contract. Rather, no prejudice to defendant being apparent from plaintiff's withholding his claim for damages pending an administrative decision on his claim for a refund, plaintiff should be permitted to assert a claim for damages in his petition in this court.[8] *Cf.* Air-A-Plane Corp. v. United States, 408 F.2d 1030, 1034–1036, 187 Ct.Cl. 269, 278–280 (1969); Nager Elec. Co. v. United States, 368 F.2d 847, 177 Ct.Cl. 234 (1966).

Based upon the foregoing, it is concluded that summary judgment on the affirmative defenses of estoppel, waiver, and accord and satisfaction should be denied.

### Conclusion

Plaintiff's motion for summary judgment under Count I is granted, and defendant's cross-motion is denied, for the purchase price refund in the stipulated sum of $570.18. Plaintiff's motion for summary judgment with respect to the loading-charge refund is denied and defendant's cross-motion is granted with the petition dismissed as to it. Defendant's motion for partial summary judgment as to Counts II and III is denied and the case is remanded to the trial judge for trial on those two counts.

8. Of course, plaintiff should not receive both the full value of the performance promised him as well as restitution of the full value of what he gave for it, so the refund should be credited against any damages plaintiff receives, should he make out a case for breach of contract.