**Julius PETROFSKY, d/b/a Petrof Trading Company**

v.

**The UNITED STATES.**

**No. 840–71.**

United States Court of Claims.

Feb. 20, 1980.

As Amended Feb. 22, 1980.

Julius Petrofsky, pro se.

Ray Goddard, Washington, D. C., with whom was Asst. Atty. Gen. Alice Daniel, Washington, D. C., for defendant. R. W. Koskinen and William J. Demik, Washington, D. C., of counsel.

Before KASHIWA, KUNZIG and BENNETT, Judges.

## OPINION

**PER CURIAM:**

This case comes before the court, having been submitted on the briefs and oral argument of plaintiff, *pro se,* and defendant's attorney, on plaintiff's exceptions to the recommended decision of Trial Judge Robert J. Yock, filed September 29, 1978, pursuant to Rule 134(h), and on plaintiff's motion, filed December 6, 1978, for an order to the defendant to produce documents. Upon consideration thereof, together with the re-sponses and replies thereto, the court denies plaintiff's said motion to produce documents and since the court agrees with the trial judge's recommended decision, as hereinafter set forth, it hereby affirms and adopts the decision as the basis for its judgment in this case. Accordingly, it is concluded that plaintiff is entitled to recover the sum of $570.18 in accordance with the decision entered herein on December 19, 1973 (203 Ct.Cl. 347 at 367, 488 F.2d 1394), but that plaintiff is not entitled to recover under Counts II and III of the petition. Judgment is entered for plaintiff for $570.18 with the petition otherwise dismissed.

## OPINION OF TRIAL JUDGE

YOCK, Trial Judge: This case arises out of a contract for the sale and removal of smokeless gunpowder owned by the United States Navy. The contract was terminated for default more than 16 years ago. In the course of the protracted litigation which has followed, numerous disputes pertaining to the contract have been aired, several of which were resolved by this court's Wunderlich Act review of the decision by the Armed Services Board of Contract Appeals. *Petrofsky v. United States*, 203 Ct.Cl. 347, 488 F.2d 1394 (1973); ASBCA No. 11863, 70–1 BCA ¶ 8272. However, the court also found it necessary to remand the case for trial on plaintiff's allegations of breach of contract contained in Counts II and III of the petition, as amended.

In Count II, plaintiff basically alleges that the Navy Ammunition Depots interfered with his removal of the gunpowder from the depots. In Count III, framed in the alternative, plaintiff basically alleges that the Navy unlawfully terminated the contract without giving sufficient notice contemplated by the terms of the contract. At the final pretrial conference held on May 2, 1977, the plaintiff abandoned all claims for breach of contract under Counts II and III save for those claims pertaining to interference and termination at the Navy Ammunition Depot (NAD), Hawthorne, Nevada for the last 3 months of the contract

(February 18 to May 18, 1962). Trial was conducted on that basis, with the plaintiff proceeding *pro se*. For the reasons discussed herein, the plaintiff is not entitled to recover.

### Facts

In 1960, the United States Navy held in storage substantial quantities of smokeless gunpowder which were deteriorating into an unstable condition. Since the powder retained some useful value if reprocessed or combined with other material, the Navy decided to dispose of it by sale and issued Sales Invitation No. B–80–60–171 on May 31, 1960, for that purpose.

Plaintiff submitted a bid for part of the offered quantity and on August 19, 1960, was awarded Contract No. N–171–21478A for the sale and removal of 53,537,460 pounds of gunpowder stored at seven different Navy ammunition depots across the country, including NAD Hawthorne, Nevada. The powder was of various types and calibers, ranging in price from $0.00001 to $0.001 per pound (net weight), for a total purchase price of $2,318.70. Due to the hazardous nature of the material, the contract required that loading be performed by the Government, for which the plaintiff was to pay a fixed loading charge of $0.0036 per pound (gross weight). An acceptable loading schedule was to be arranged by plaintiff at each particular depot.

The contract also included a removal schedule with monthly removal requirements which required that the powder at all depots other than NAD Hastings, Nebraska was to be removed within a year (August 19, 1960 to August 18, 1961); a 2-year removal period (August 19, 1960 to August 18, 1962) was allowed for the powder at NAD Hastings. The 1-year removal period applicable to NAD Hawthorne was extended by two contract amendments, the first extending the removal period by 6 months (to February 18, 1962), the second extending it by 3 additional months (to May 18, 1962). The extensions did not specifically impose any monthly removal requirements but did encourage the contractors including the

plaintiff to expeditiously remove the remaining powder.

Following the award plaintiff proceeded to arrange for the removal of the powder from the various depots. The nature of plaintiff's business was that of a "jobber" or purchaser for resale. Thus, plaintiff had no intention of using the powder himself, nor did he even have the means to remove the powder by himself. He would find buyers for the powder and then make the necessary arrangements for those buyers to pick up the powder (by rail or truck) from the various depots. In this manner a substantial amount of contract powder was removed during the original 1-year removal period and the first extension period of 6 months. By the end of that time (February 18, 1962), the majority of the powder yet to be removed under the contract was stored at NAD Hawthorne. The gross weight of this remaining gunpowder was 3,929,860 pounds; the powder was stored in 26,554 galvanized steel containers weighing 38 pounds each, so the net weight of the remaining powder was 2,920,808 pounds.

Plaintiff did not remove any of this powder from NAD Hawthorne during the second extension period of 3 months. Consequently, at the end of that period (May 18, 1962), the Government issued a notice terminating the contract for default with respect to that powder.

Plaintiff complains that during the second extension period of the contract (February 18 to May 18, 1962) the Government interfered with the orderly removal of the powder from NAD Hawthorne in that it failed to provide the appropriate information requested and necessary for the removal operation. Specifically, plaintiff complains that the Government failed to provide access information (rail or truck) and information related to the outloading capacity of the depot. Failure to provide these two necessary information ingredients, the plaintiff maintains, kept him from removing the powder prior to the expiration date of the contract.

The plaintiff also complains that the Government unlawfully terminated the con-

tract (which was an additional arbitrary and capricious act of interference) in that it did not give plaintiff the appropriate notice as contemplated under the terms of the contract.

As a result of these asserted actions, plaintiff alleges the Government breached the contract and that he suffered damages totalling approximately $350,000 based on the value of the undelivered containers, and the lost profits on a contract for resale of the undelivered powder. It is concluded that plaintiff's allegations of breach are without merit, and therefore plaintiff is not entitled to recover.

*Discussion*

### I. *Withheld Information Claim*

█ The plaintiff concentrated his evidentiary presentation on his first breach of contract claim. This claim was that the Government hindered or interfered with his performance of the contract during the second contract extension period by withholding essential information. Plaintiff claims the needed information was of two types: (1) the type of access to each storage magazine containing the contract powder (whether by truck, rail, or both); and (2) the outloading capacity of the depot (the number of truck or rail car loads which could be loaded per day).

To begin with, it should be pointed out that this court holds to the view that every contract has an implied condition that "neither party to the contract will do anything to prevent performance thereof by the other party or that will hinder or delay him in its performance." *Petrofsky v. United States*, 203 Ct.Cl. 347, 365, 488 F.2d 1394, 1404 (1973); *Wah Chang Corp. v. United States*, 151 Ct.Cl. 41, 49, 282 F.2d 728, 733–34 (1960).

█ Also, as a general matter, the Government may be found in breach of a contract where it deliberately withholds information vital to the contract's performance, thereby misleading the contractor and causing him injury. *Helene Curtis Industries, Inc. v. United States*, 160 Ct.Cl. 437, 443–44, 312 F.2d 774, 777–78 (1963). The

corollary to this rule is that the Government is under no duty to volunteer information which the contractor can reasonably be expected to seek out himself. *H. N. Bailey & Assoc. v. United States*, 196 Ct.Cl. 166, 178, 449 F.2d 376, 383 (1971). The latter rule will be applied in situations where the information at issue can readily be obtained from outside sources (*Firestone Tire & Rubber Co. v. United States*, 214 Ct.Cl. 457, 480, 558 F.2d 577, 589 (1977)), or where the contract itself contemplates a certain means by which the information might be acquired, such as by site investigation. *Ambrose-Augusterfer Corp. v. United States*, 184 Ct.Cl. 18, 38, 394 F.2d 536, 548 (1968).

In this case, clause 7 (Delivery and Removal of Property) of the contract specifically invited the plaintiff to seek clarifying removal information not otherwise found in the contract from the contracting officer. Further, clause 21 (Loading) stated that the purchaser and the holding activity (*i. e.*, depot) would arrange an acceptable loading schedule.

█ With the above principles and contract clauses in mind, plaintiff's claim concerning the withholding of access information will be considered. At the outset, it is necessary to determine whether the desired information was vital or essential to plaintiff's performance of the contract. There can be little doubt that access information was indeed of that character. Freight costs would be an important part of any resale bargain plaintiff could make, since those costs alone were likely to approach, if not exceed, the price of the powder itself. Thus, whether the powder was accessible by truck or by rail was an important consideration in making resale arrangements. Some buyers apparently did not have the facilities to make removal by rail a feasible alternative. In addition, access information was necessary to enable plaintiff to coordinate properly the Government loading operations with the arrival of the buyer's carriers.

Access information was vital to the contract. Since the plaintiff was well aware

by his own testimony of the vital nature of the access information to the contract, he could reasonably have been expected to seek out that information for himself, as contemplated by the express terms of the contract.

Since the only source for the information was the depot itself, the Government was required to furnish the information upon plaintiff's request. Such cooperation between the plaintiff and the Government was obviously contemplated by the contract itself as evidenced by the language in Paragraph 21 that "the Purchaser and the holding activity will arrange an acceptable loading schedule." Certainly the type of access to the storage magazines would be an important detail in arranging a loading schedule. Thus, the responsibility for communicating this information rested to some extent on both parties. It was incumbent upon plaintiff to inquire about access when necessary, and the Government was obligated to furnish the information upon request.

The record shows that NAD Hawthorne did in fact furnish plaintiff some information concerning access to the remaining powder, although plaintiff strongly insists that information was inadequate. In a letter dated October 19, 1961, the commanding officer at NAD Hawthorne, Capt. Fredric B. Clarke, advised plaintiff as follows:

> The enclosure to this letter provides the location of the powder by type and building number as of 5 October 1961. These buildings are accessible by *rail or truck*. [Emphasis added.]

Plaintiff contends that the use of the conjunction "or" in the second quoted sentence carries the implication that some of the buildings were accessible by one means and not the other; and since the letter does not specify which buildings had which types of access, the statement is not at all helpful. The Government's position is that the disputed sentence was intended to convey that each of the buildings had access *both* by rail *and* by truck. The Government maintains that in fact all the buildings were accessible by both truck and rail, although the evidence offered in support is not sufficient to warrant a finding on the matter.

The proper interpretation of the sentence is open to reasonable doubt. Plaintiff's interpretation of "or" as presenting two mutually exclusive alternatives, as in the phrase "your money or your life," is certainly plausible. Yet the Government's interpretation of "or" as presenting two alternatives not excluding one another, as in the sentence "you can get there by bus or by train," is also plausible. In any event, it is not necessary to decide which interpretation is the correct one. As noted above, it was plaintiff's responsibility to inquire about access. If plaintiff felt that the information provided by the letter was insufficient to make the arrangements for removal of the powder, then plaintiff should have sought clarification of the matter from the Government. Unfortunately for the plaintiff, there is no direct evidence in the record other than his own testimony to support his assertion that he did make further inquiries of NAD Hawthorne on this subject.

The only written request for information from NAD Hawthorne in the record is plaintiff's letter of January 22, 1962. In this letter plaintiff sought information regarding powder quantities, containers, and lot numbers. No mention of the need for more detailed access information was made. There is indirect evidence that plaintiff made an earlier written inquiry to NAD Hawthorne on November 27, 1961, regarding storage charges on the unremoved powder. The letter itself is not in the record, however, so there is no basis for determining whether further access inquiry information was a part of it.

Plaintiff has attempted to show that he made the necessary inquiries by introducing into evidence an assortment of telephone bills, hotel bills, plane tickets, and toll road receipts. This evidence does show that plaintiff was in frequent contact with NAD Hawthorne (as well as Government contract personnel in Washington, D. C.) during the latter part of 1961 and the first 5 months of 1962. However, there is no evidence other than plaintiff's own testimony indicating precisely what was discussed at those times.

The history of this contract reflects numerous disputes between the parties,[1] any of which could well have been the topic of discussion at those times.

At trial, plaintiff called as witnesses two Navy officials involved in the administration of the contract, Mr. Joseph D. Trollinger and Mr. Leonard A. Vickers. Both of these gentlemen were at the time stationed at the Naval Weapons Plant Supply Department in Washington, D. C. and both recalled having met with plaintiff concerning this contract. But neither testified that plaintiff raised with them the problem of access to the powder at NAD Hawthorne. Mr. Trollinger did testify that he referred plaintiff back to the individual depots on matters related to outloading. No personnel from NAD Hawthorne were called to testify at trial.[2]

In his own testimony, plaintiff acknowledged that NAD Hawthorne never flatly refused to furnish the access information. He asserted that NAD Hawthorne promised to furnish the information, but simply never did so. Yet the plaintiff never complained in writing to the Government about his failure to receive the information.

The record shows that on at least two other occasions plaintiff requested, in writing, other kinds of information from NAD Hawthorne. Given the vital nature of the access information, it is not inappropriate to expect that plaintiff would also have requested that information in writing, if indeed he had made such a request. But there is no evidence of such a document. In light of all these facts, discussed above, there is simply not enough evidence in the record to support plaintiff's claim that he inquired of NAD Hawthorne concerning access after the October 19, 1961 letter was received by him.

Even if the necessary inquiry had been made, however, it is far from clear that this alleged lack of information interfered with plaintiff's efforts to remove the powder from NAD Hawthorne. Prior to the second extension period, the plaintiff had arranged for the removal of several million pounds of powder from NAD Hawthorne by both truck and rail. Four separate companies purchased powder from the plaintiff between January 1961, and January 1962. All four companies sent in their trucks or rail cars to NAD Hawthorne and had no trouble getting the appropriate access information to accomplish the outloading process. The plaintiff either had to arrange this access with the depot and the purchaser or allow the purchaser to so arrange with the depot. In any event, the necessary access experience and knowledge would have been acquired by the plaintiff by direct or indirect contact with the depot. Although there may have been some problems in connection with these shipments, none of the problems had to do with powder access or stemmed from inadequate information about access. In view of the above history, it is hard to credit plaintiff's argument that access information was denied him during the contract extension period from February 18 to May 18, 1962, and thus interfered with his performance of the contract.

Aside from the above, and the fact that the Navy Department was very anxious to get rid of the unstable powder from their depots, there is good evidence in the record

1. Among the matters in dispute were packing shortages, powder misshipments, Government loading charges, the purchase price of the powder (gross weight or net weight), loading delays, loading preferences given to other depots, storage charges, and shoring and bracing expenses.

2. In his brief, plaintiff complains that the Government did not respond satisfactorily to his interrogatories seeking the names and addresses of persons having responsibility for administering the contract or having any relevant information pertaining to the suit. As a result, plaintiff alleges that he was unable to locate possible witnesses for his case. It is not clear what sort of relief plaintiff is seeking based on these allegations. In any event, the time for raising such a complaint is in the pretrial stage. Rule 73(d) provides a judicial remedy for an incomplete or evasive answer to an interrogatory, but plaintiff never sought to invoke that remedy. (It might be noted that plaintiff did have legal counsel throughout the pretrial stage, up until 2 weeks before trial.) Therefore, it is deemed unnecessary to give this matter any further consideration.

to conclude that plaintiff's failure to remove the powder prior to the contract's expiration was due chiefly to plaintiff's delay in finding a buyer, rather than to any lack of information. This proposition will be discussed in greater detail below.

The second type of information which plaintiff claims was wrongfully withheld by the Government related to NAD Hawthorne's outloading capacity. Unlike access information, it is just not clear that this information was essential or vital to plaintiff's contract performance. NAD Hawthorne's outloading capacity was sufficient to remove all the powder within the time allotted by the contract, especially in view of the contract extensions. Therefore, plaintiff really had no need to know what the depot's exact outloading capacity was, assuming that he did not delay making his resale arrangements until near the end of the contract period. If he did delay in making those arrangements, then knowledge of the depot's outloading capacity might become important in order to determine how much powder could be removed before the contract expired. Thus, outloading capacity information was not essential in itself, and only became important if plaintiff delayed in performance, which was by itself a breach by the plaintiff of the contract provisions.

Even if it were found that this information was essential to contract performance, plaintiff could reasonably have been expected to seek out the information himself. Again, however, the evidence presented by the plaintiff on this point is insufficient to carry his burden as to whether he even requested it.

Moreover, outloading capacity is also the sort of information which is readily acquired as the contract is performed. By the beginning of the second extension period (February 18, 1962), the plaintiff had removed over 3 million pounds of powder from NAD Hawthorne by truck and rail. Given this experience, plaintiff should have been able to form a fairly good estimate of that depot's outloading capacity.

Finally, there has been no showing that plaintiff's removal efforts were actually hindered by the depot's outloading capacity, or by the plaintiff's purported lack of knowledge of that capacity. No attempt was made to remove any of the powder during the second extension of time, which is the period here in question. Even assuming that plaintiff lacked this knowledge, that fact should not have prevented plaintiff from at least making an attempt to remove as much of the powder as possible before the contract expired. The point is that plaintiff never put NAD Hawthorne's outloading capacity to the test, during the extension period.

As mentioned earlier, the record strongly suggests that the real reason for plaintiff's failure to remove the powder on time is that he, in hopes of getting a top price for the powder, had simply waited too long to find a buyer. Early in the course of the contract, plaintiff sold 20 to 30 million pounds of powder from other depots to Olin Mathieson Chemical Company at scrap prices in order to "buy time" for other, more lucrative deals. Another instance of buying time was the sale of 2 million pounds of NAD Hawthorne powder to Hercules Powder Company at $0.01 per pound in late 1961.

One of those other more profitable deals long sought by the plaintiff was with Horne-Jeffreys Burbank Chemical Company. Horne-Jeffreys was interested in reprocessing the powder for use in the production of lacquer, for which it was willing to pay a higher price than companies interested in the powder as an explosive. However, the company was having great difficulty in obtaining permission to bring this dangerous material to their plant in heavily-populated Burbank, California. The plaintiff waited for the company to resolve this problem for almost a year and a half, until he could wait no more. Plaintiff testified to the situation in the following way:

In other words, I was buying time in whatever sales I made to these other companies, to buy time for Horne-Jeffreys Burbank Chemicals to solve its

problems. \* \* \* [N]othing ever did come of Horne-Jeffreys Burbank Chemicals' plan to use all of the gunpowder if they had succeeded in solving their particular problem. This was not the fault of the government, but I just sold off what I could to meet the schedule and held off in Nevada as long as I could, and then finally decided, nothing is going to come of it, sell what remains, sell it to Oriard [Powder Company], which had wanted it or indicated that they had wanted it, \* \* \*. [Tr. pp. 60–1.]

As the testimony shows, plaintiff arranged to sell the remaining powder to Oriard Powder Company after the Horne-Jeffreys deal fell through. This took place sometime between November 1961 and January 1962. Despite this agreement, the powder was never picked up. At the time the agreement was made, the contract was set to expire on February 18, 1962. On February 16, the contract was amended to extend the removal period by 3 months, until May 18, 1962. Whether Oriard was ready and able to remove the remaining 3,929,860 pounds of powder within the time remaining under the contract is simply not clear from the record. What is clear is that no attempt was made by plaintiff or Oriard to move the powder out.

In any event, plaintiff has failed to meet his burden of showing that the Government's failure to disclose information concerning access and outloading capacity interfered with his efforts to remove the powder during the second extension period. The more likely reason, evident from the record, is that the plaintiff simply waited too long to find a buyer for this powder. Of course it is understandable that the plaintiff would hold off selling the powder until he found a buyer at the best possible price. The risk accompanying such a policy was that the removal period would expire and the remaining powder would be lost if he waited too long. Unfortunately, that risk became a reality.

For all these reasons, plaintiff's claim that the Government interfered with the performance of his contract by withholding essential information must be rejected.

## II. *Termination Claim*

The plaintiff also alleges that the contracting officer's notice terminating the contract for default on May 18, 1962, was an arbitrary and capricious act amounting to another instance of interference with plaintiff's removal efforts. Under the factual circumstances of this case, however, termination of the contract (or more appropriately stated, the refusal of the contracting officer to further extend the contract) does not appear to have been an unreasonable decision. The plaintiff had already been given two time extensions on this contract, which had added 9 months to the 1-year removal period originally provided in the contract. The evidence also confirmed that the longer the powder remained at the depot, the more unstable it became. Thus, safety considerations alone would justify the contracting officer's refusal to grant any further extensions and would allow the Navy to dispose of the unstable powder promptly, by burning, which was the usual method of disposing of unstable powder. Therefore, the Government's decision refusing to further extend the contract is not an arbitrary and capricious act amounting to a breach of contract. *Cf. Everett Plywood Corp. v. United States,* 206 Ct.Cl. 244, 258, 512 F.2d 1082, 1090 (1975) (refusal to extend contract held a breach where such extensions were shown to be a well-established practice or custom in those circumstances and consistent with Government regulations).

The plaintiff further complains that the Government terminated the contract for default without giving the proper notice supposedly required by paragraph 7 of the contract. That paragraph is entitled "Delivery and Removal of Property," and reads in pertinent part:

> \* \* \* If the Purchaser fails to remove the property within the specified time, the Government shall have the right to charge the Purchaser and collect upon demand a reasonable storage charge if the property is stored on premises owned or controlled by the Government, or store

the property elsewhere for the Purchaser's account, and all costs incident to such storing, including handling and moving charges, shall be borne and paid by the Purchaser; *in addition to the foregoing rights, the Government may, after the expiration of thirty (30) days after the date specified for removal, and upon ten (10) days' written notice (calculated from the date of mailing) to the Purchaser (which ten (10) days' written notice may, at the option of the contracting officer, be included either partly or wholly in the thirty (30) days specified or may be in addition thereto), resell the property applying the proceeds therefrom against the storage and any other costs incurred for Purchaser's account.* \* \* \* [Emphasis added.]

Plaintiff contends that the Government could only terminate the contract according to this clause and thus he was to be given 10 days notice of termination, plus an additional 30 days to remove the remaining gunpowder from NAD Hawthorne.

Plaintiff's contentions in this regard are misplaced for several reasons.

First, the clause does not speak to termination of the contract. Rather the clause speaks to the Government's permissive post-termination rights to seek storage and resale charges against the plaintiff in the event plaintiff fails to remove the powder pursuant to the removal schedule of the contract. In fact the 10 days'–30 days' language is further limited, in that it applies only if the Government decides to *resell* the gunpowder to some other buyer and seeks to charge the plaintiff for the appropriate storage and resale costs. Thus, the clause speaks to the Government's rights, if it chooses to exercise them. In this case, the Government made no attempt to exercise those rights, *i. e.,* to resell the powder. Further, the clause does not speak to rights of the contractor to be given further extensions or cures on the contract. The clause imposes no notice requirements prior to termination of the contract. In fact, the clause does not even mention termination. So the short answer to the plaintiff's contention is that the clause doesn't require what the plaintiff says it does.

Second, the plaintiff fails to read clause 7 in conjunction with the other more pertinent clauses of the contract, which deal with removals, breaches, and terminations. For instance, proviso 1 of the contract stated:

Failure of the Contractor to remove the property listed for any specified monthly period in accordance with Schedule I at the minimum monthly quantities shown shall constitute a total breach of the contract and entitle the Government to proceed in accordance with clause number 18, entitled Bid Guarantee and Liquidated Damages. Further, the Government shall not be required to give notice of the Contractor's failure to remove the minimal monthly quantities set forth in the Schedule; the Government's failure to give notice as to any one breach shall not cause a waiver of the Government's right to exercise its rights as to any successive breach.

Also, additional proviso (clause) 18 stated in pertinent part:

\* \* \* If after award the Purchaser fails to pay the balance of the purchase price, fails to remove the material or otherwise fails to perform any of the purchaser's obligations, *the Government may retain the material* and either assess the Purchaser, or retain from any amount paid by the Purchaser, as liquidated damages, a sum equal to twenty percent (20%) of the purchase price. The balance, if any will be remitted to the Purchaser. [Emphasis added.]

▮ The Government terminated the contract, retained the material with appropriate remittals, and did not seek to resell the powder to another buyer and charge the storage and other appropriate costs to the plaintiff. After reading these provisions and the contract in its entirety, one can only come to the conclusion that the Government lived up to the terms of the contract and was under no further requirement to give the additional notice contemplated under clause 7 of the contract. It is

settled in this court that "[a] contract must be considered as a whole and interpreted so as to harmonize and give meaning to all of its provisions." *Victory Carriers, Inc. v. United States,* 199 Ct.Cl. 410, 421, 467 F.2d 1334, 1342 (1972). Further, as stated in *Hol-Gar Manufacturing Corp. v. United States,* 169 Ct.Cl. 384, 395, 351 F.2d 972, 979 (1965):

> \* \* \* [A]n interpretation which gives a reasonable meaning to all parts of an instrument will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless or superfluous.

Plaintiff's attempt to isolate clause 7 from the other provisions of the contract is inconsistent with these settled principles. *See also Petrofsky v. United States,* 203 Ct.Cl. 347, 357–58, 488 F.2d 1394, 1400 (1973).

Finally, and in addition, the plaintiff's contention that the contract could only be terminated under clause 7 is misplaced because the contract contained a definite expiration date by which the powder had to have been removed. The second contract extension called for the powder to be removed during the 90-day "clean up phase" of the contract and set May 18, 1962, as the expiration date. That extension granted the plaintiff a reasonable time in which to remove the powder. He failed to remove any of the remaining powder during this time frame due to his own problems and not due to any fault on the Government's part. Consequently, the termination of the plaintiff's contract for default was appropriate under the facts of this case, and consistent with the terms of the contract. The Government's notice of default had the effect of confirming to the plaintiff that the contract had expired as of May 18, 1962, that no further extensions would be considered, and that that action had been taken because of plaintiff's default in failing to perform without adequate reason.

The Government granted the plaintiff everything he was entitled to under the terms of the contract and was generous in even granting the two extensions it did grant. Plaintiff's contentions to the contrary are therefore misplaced.

For all of the above reasons, plaintiff's contentions regarding the expiration of the contract are found to be without merit.

It necessarily follows that plaintiff is not entitled to recover under any of his contentions.

## FINDINGS OF FACT

1. The plaintiff, Julius Petrofsky, is the sole proprietor of a business which, trading under the name of Petrof Trading Company, was engaged in the purchase for resale of Government surplus material during the period in question.

2. On August 19, 1960, the United States Navy accepted plaintiff's bid in response to Sales Invitation No. B–80–60–171, and awarded him Contract No. N–171–21478A for the sale and removal of 53,537,460 pounds of smokeless gunpowder stored at seven Naval Ammunition Depots (NAD's) across the country. The unit prices for the various types and calibers of the gunpowder ranged from $0.00001 to $0.001 per pound (net weight), for a total contract price of $2,318.70. Due to the hazardous nature of the material, the contract required that loading be performed by the Government, for which plaintiff was to pay a fixed loading charge of $0.0036 per pound (gross weight). A removal schedule was included in the contract, providing that all the powder was to be removed from the specified depots within a 12-month period (August 19, 1960 to August 18, 1961), with the exception of the powder at NAD Hastings, Nebraska, for which a 2-year period was provided.

The 1-year removal period for the other depots was later extended by two contract amendments, the first being a 6-month extension to February 18, 1962, the second a 3-month extension to May 18, 1962.

The 1-year removal schedule of the contract also included monthly removal requirements to be met by the plaintiff. The extension amendments dropped these monthly removal requirements but encouraged the contractors to expeditiously re-

move the remaining powder by the appropriate expiration dates.

3. Following the award, plaintiff proceeded to arrange for the removal of the gunpowder from the various depots. Nevertheless, plaintiff had not removed all of the purchased gunpowder by the end of the second extension period (May 18, 1962) and on that date the defendant terminated the contract for default with respect to the powder remaining at all the depots other than NAD Hastings. (The contract terminated with respect to the Hastings powder on August 19, 1962.) Upon termination, plaintiff has removed a total of 49,546,467 pounds of powder, leaving some 3,990,993 pounds of powder for which plaintiff had paid but not received. *See Petrofsky v. United States*, 203 Ct.Cl. 347, 355, 488 F.2d 1394, 1398 (1973).

4. The only unremoved powder which is at issue in this case is that which was stored at NAD Hawthorne, Nevada. Of the total contract quantity of 53,537,460 pounds of gunpowder, 7,126,350 pounds were stored at NAD Hawthorne.

5. The table below lists the quantities of powder removed by plaintiff from NAD Hawthorne during the course of the contract, together with the dates of removal, the mode of shipment, the resale purchaser, and the number of containers removed:

### NAD Hawthorne Removals

| Date | Weight Gross | Net | No. of containers | Mode of Shipment | Resale Purchaser |
|------|------|------|------|------|------|
| 1/3/61 | 40,004 | — | 275 | Truck | Oriard |
| 1/27/61 | 42,900 | — | 284 | Truck | Oriard |
| 2/7/61 | 26,208 | 19,110 | 182 | Truck | Intermountain |
| 5/10/61 | 42,530 | 31,900 | 290 | Truck | Oriard |
| 8/25/61 | 24,950 | 19,690 | 172 | Truck | Oriard |
| 11/8/61 | 40,880 | 30,090 | 277 | Truck | Oriard |
| 11/15/61 to 1/3/62 | 2,948,000 | 2,185,067 | 19,872 | Rail | Hercules |
| 12/11/61 | 39,410 | 29,700 | 270 | Truck | Intermountain |
| Total | 3,204,882 | — | 21,622 | | |

The plaintiff removed no more NAD Hawthorne powder from January 3, 1962 to May 18, 1962.

6. The record is not entirely clear regarding the amount of powder remaining at NAD Hawthorne at the time the contract was terminated. Plaintiff alleges in his brief that the net weight of the remaining powder was 2,866,750 pounds. Yet the table above seems to indicate that the figure should be much larger (the gross weight of the powder was 3,204,882 pounds, and the net weight of all the powder at NAD Hawthorne at the beginning of the contract was 7,126,350 pounds). The most direct evidence pertaining to the amount of unremoved powder at NAD Hawthorne is a letter from that depot to plaintiff, dated February 13, 1962, stating that a storage rental charge was due on the unremoved powder. As of January 18, 1962, the total gross weight of the remaining powder was 3,929,860 pounds, according to the letter. Since plaintiff removed no more powder after January 3, 1962, this figure is accepted as the correct gross weight of the powder remaining at NAD Hawthorne at the date of termination, May 18, 1962.

7. There is no direct evidence regarding the *net* weight of the unremoved powder, but it is possible to extrapolate a reasonable net weight figure from known facts about the powder containers and the gross weight figure of 3,929,860 pounds. The powder was stored in special MK 7 galvanized containers, weighing about 38 pounds each, with a capacity of 110 pounds of smokeless powder. Thus, the gross weight of a container filled with powder would be 148 pounds. The number of full containers required to reach a gross weight of 3,929,860

pounds is therefore 26,554 (3,929,860 ÷ 148). The net weight of the remaining powder can now be derived by subtracting the weight of the containers (26,554 cans × 38 pounds each) from the gross weight. The difference is 2,920,808 pounds, and this figure is accepted as the correct net weight of the unremoved powder at NAD Hawthorne. The number of unremoved containers is found to be 26,554 as noted above.

8. The plaintiff did not remove the powder from the depots himself; rather he contacted other buyers for the powder, and arranged for those buyers to pick up the powder. In order to make these removal arrangements, plaintiff or the buyers had to obtain the following information from the depots:

(a) the location of the powder;

(b) the availability of depot loading crews;

(c) the outloading capacity of the depot; and

(d) the type of access to the powder magazines (rail or truck).

After obtaining this information, plaintiff would notify the buyer when the powder was available for pickup, and by what means. Plaintiff would then notify the depot a week or so in advance of the pickup date. If the powder was to be removed by rail, the Government was responsible for ordering in the rail cars, deciding the number of cars that were necessary and determining their availability.

9. By letter dated October 19, 1961, NAD Hawthorne provided the plaintiff with information pertaining to the powder remaining for removal at that depot. The letter read, in pertinent part:

"The enclosure to this letter provides the location of the powder by type and building number as of 5 October 1961. These buildings are accessible by rail or truck."

This letter is the only written communication in the record having to do with the type of access to the unremoved powder. Neither this letter nor anything else in the record indicates with specificity the type of access available for each particular storage building, whether rail, truck, or both. An "Area Development Map" of NAD Hawthorne introduced into evidence by the plaintiff is of little help in this respect for several reasons: (1) it is only a partial map of the depot; (2) it was apparently made in 1954, and there is no evidence that it accurately depicts the depot in the years 1960–1962; and (3) there is no indication as to which of the buildings on the map contain the contract powder.

10. Plaintiff did receive the particularized access information he desired from the other six ammunitions depots. Some of the storage magazines at these depots were accessible by both rail and truck, some by rail only, and some by truck only.

11. During the contract period, plaintiff was never furnished information in writing concerning NAD Hawthorne's outloading capacity. Although not formally notified of this information by the Government, plaintiff, by the second contract extension period, knew or should have known NAD Hawthorne's outloading capacity through his experience in removing the powder in 1961.

12. Plaintiff never submitted a written request for access or outloading capacity information to NAD Hawthorne. Plaintiff did address one inquiry to NAD Hawthorne regarding powder quantities, containers, and lot numbers on January 22, 1962, to which NAD Hawthorne replied on January 30, 1962. In a letter to plaintiff dated February 13, 1962, NAD Hawthorne references a letter from plaintiff dated November 27, 1961. Plaintiff's letter is not in evidence, but it apparently only had reference to storage rates for the remaining powder. These two letters are the only instances in which plaintiff sought information from NAD Hawthorne in writing.

13. Plaintiff frequently traveled to Washington, D. C., during the course of the contract to discuss various contractual problems with Navy personnel at the Naval Weapons Plant Supply Department. Included among the officials contacted were Joseph D. Trollinger and Lt. Comdr. Leonard A. Vickers, both of whom were involved

in the administration of the contract as contracting officers and disposal officers. These officers referred the plaintiff back to the individual depots for information pertaining to removal matters.

14. During the latter part of 1961 and the first 5 months of 1962, plaintiff was in frequent contact with NAD Hawthorne by telephone and in person. There is no direct evidence other than plaintiff's own testimony indicating precisely what was discussed at those times.

15. Among the matters in dispute during the course of this contract were packing shortages, powder misshipments, Government loading charges, the purchase price of the powder, loading delays, loading preferences given to other depots, storage charges, and shoring and bracing expenses incurred in rail shipments.

16. NAD Hawthorne never outright refused to furnish plaintiff with access or outloading capacity information. Plaintiff never complained to anyone in writing about his failure to get this information.

17. From the foregoing, it is concluded that plaintiff did not make significant efforts to obtain information from NAD Hawthorne pertaining to access or outloading capacity.

18. In addition, experience gained and knowledge acquired by earlier truck and rail shipments out of NAD Hawthorne should have minimized the necessity for detailed access information.

19. During the latter part of 1961, plaintiff entered into an oral agreement with Oriard Powder Company of Deer Park, Washington, for the sale of about 3 million pounds of powder at a "handshake" price of $0.06 per pound. Oriard was to pick up the powder at NAD Hawthorne by truck, and would pay for the powder as it was used or resold over a period of 5 years. Oriard intended to use the powder to manufacture an explosive used in construction and mining. Oriard never did pick up any of this powder from NAD Hawthorne during the second contract extension period (February 18 to May 18, 1962). The reason was that Oriard was waiting for the plaintiff to advise him that the powder was available for pickup.

Oriard had earlier in 1961 under similar oral agreements picked up five truckloads of powder from NAD Hawthorne, amounting to about 150,000 pounds net weight. Oriard encountered no access or loading problems on these five truckload shipments.

Payment for the five truckloads of powder Oriard did pick up was not made until some years later. At that time plaintiff received a sum of money which was intended to pay off several debts to plaintiff, and no allocation was made as to how much was paid for the five truckloads alone. It is clear that plaintiff did not receive the $0.06 per pound handshake price, but rather was paid on a "for what it's worth basis."

20. Plaintiff also sold two truckloads of NAD Hawthorne powder to Intermountain Research and Engineering Company in 1961, on an oral agreement with a handshake price of $0.04 per pound. Plaintiff was never paid for these shipments because they were found unsatisfactory by Intermountain. However, Intermountain encountered no access or loading problems at NAD Hawthorne on these two shipments.

21. From November 15, 1961 through January 3, 1962, plaintiff sold 2,185,067 pounds of NAD Hawthorne powder to Hercules Powder Company on an oral contract at a price of $0.01 per pound. Hercules shipped the powder by rail, making their own access and outloading arrangements with NAD Hawthorne, and encountered no problems.

22. Throughout the course of the contract, plaintiff had been attempting to work out a far more profitable deal with Horne-Jeffreys Burbank Chemical Company, who wanted the powder at NAD Hawthorne for use in manufacturing lacquer. Horne-Jeffreys had difficulty in obtaining permission to bring this dangerous material to its plant in Burbank, California, and it became apparent to plaintiff towards the end of 1961 that a deal would not be possible in time to remove the powder by the first contract expiration date. Consequently, plaintiff de-

cided to sell the rest of the NAD Hawthorne powder to Oriard.

23. Early in the course of the contract, plaintiff sold 20 to 30 million pounds of powder from other depots to Olin Mathieson Chemical Company at scrap prices. This was done in order to buy time for other more lucrative deals.

24. The longer the powder remained in storage at the depot, the more unstable it became. The Navy Department was anxious to get rid of this unstable powder from the depots. The usual method of disposing of unstable powder was to burn it.

25. The contracting officer's decision to terminate the contract and thus not to grant any further contract extensions, under the facts of this case was not an arbitrary and capricious act. Safety considerations alone would justify the decision.

26. The Government was under no duty to extend the contract for a third time. The terms of the contract, as amended, provided for a definite expiration date, and there was no contrary custom or practice in the trade (or Government regulation) which would require further contract amendment.

27. The contract had a clause (clause 7) which allowed the Government certain permissive post-termination rights. Specifically, it allowed the Government to charge storage and resale costs to the contractor in the event the contractor failed to remove the powder as called for by the contract.

28. The Government did not seek to resell the gunpowder after termination of the contract on May 18, 1962, and charge the appropriate costs to the plaintiff. The Government retained the powder and disposed of it by burning it sometime after the contract was terminated.

29. Other clauses in the contract (expiration date, proviso 1, clause 18) permitted the Government to terminate the contract for default in the event the purchaser failed to remove the powder within the scheduled time. There was no standard default termination clause in the contract.

30. The contracting officer's letter of May 18, 1962, terminating the contract for default, confirmed that the contract had expired as of that date, that there would be no further extensions on the contract, and that the Government viewed the action as appropriate under the circumstances, because of plaintiff's breach in failing to remove the powder.

31. Plaintiff's failure to remove the remaining contract powder at NAD Hawthorne was caused by his own acts and was not due to any acts of hindrance or interference on the part of the Government, nor was it due to any unlawful action by the Government in terminating the contract as it did.

## CONCLUSION OF LAW

Upon the foregoing findings of fact and opinion and the decision entered herein on December 19, 1973 (203 Ct.Cl. 347 at 367, 488 F.2d 1394), it is concluded as a matter of law that plaintiff is entitled to recover the sum of $570.18 and judgment is entered for plaintiff in that amount, but that plaintiff is not entitled to recover under Counts II and III of the petition and except for plaintiff's recovery of $570.18 the petition is dismissed.

