Lewis B. UDIS, Individually and Trading As Alan Scott Industries, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 419–82C.

United States Claims Court.

Feb. 6, 1985.

Charles J. Arena, Philadelphia, Pa., for plaintiff.

R. Anthony McCann, Washington, D.C., with whom was Asst. Atty. Gen. J. Paul McGrath, Washington, D.C., for defendant.

## OPINION ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

REGINALD W. GIBSON, Judge:

This contract case, brought under the Contract Disputes Act of 1978, comes before the court on defendant's motion for summary judgment and plaintiff's opposition thereto. The plaintiff seeks $46,694.80 in damages plus costs, fees and interest, alleging in support thereof that the defendant improperly terminated the contract for default. Conversely, in addition to arguing that the termination for default for failure to make delivery was proper, the defendant filed a counterclaim for the reprocurement costs it allegedly incurred in the amount of

$40,242.80 plus interest. Jurisdiction of this action is premised on 28 U.S.C. § 1491.

After thoroughly reviewing the pleadings and briefs submitted by the parties, the court concludes that defendant is entitled to partial summary judgment on certain legal issues, *infra*. However, because there are also genuine issues of material fact, defendant is denied summary judgment, in part, as discussed hereinafter.

## FACTS

The plaintiff, Dr. Lewis B. Udis, an individual, conducts business under the name of Alan Scott Industries. On June 12, 1980, Dr. Udis and the defendant (the latter represented by the Defense Personnel Supply Center (DPSC)) entered into contract number DLA120–80–C–5125 (the contract). Pursuant to the terms of said contract, the plaintiff was to supply the defendant with 12,648 NSN 6515–00–338–0300 forceps, tissue, allis, straight 6 inch, at a unit price of $3.85 each, for a total contract price of $48,694.80. Originally, the delivery date was set for October 30, 1980. However, pursuant to Modification P00001 on April 21, 1981, the delivery date was extended to September 1, 1981, in consideration of a reduction in the contract price in the amount of $2,000. Thus, the revised total contract price became $46,694.80.

On the face of the contract, the following provision was included:

CLAUSE I14 TESTING AT GOVERNMENT LABORATORY IS HEREBY INVOKED. TWENTY FOUR SAMPLES ARE TO BE RANDOMLY SELECTED BY THE QAR FROM EACH LOT PRESENTED FOR INSPECTION, AND SUBMITTED TO DPSC–ATL FOR EVALUATION. *SHIPMENT SHALL BE WITHHELD PENDING THE EVALUATION.* (Emphasis added.)

Clause I14 of the Defense Personnel Support Center Master Solicitation read as follows:

I14 TESTING AT GOVERNMENT LABORATORY (DPSC 1969 May)

Irrespective of the point of inspection, the Government reserves the right to select samples of any item at any one or more stages of production for testing at a Government laboratory. Any samples so selected shall be forwarded by the Contractor, at its expense, to such Government laboratory as shall have been directed by the cognizant inspector *and thereafter no supplies represented thereby shall, unless otherwise directed by said inspector, be shipped until the Contractor shall have been advised that such samples have been approved by such laboratory.* Such samples will, unless destroyed in testing, be packed, packaged and returned to the Contractor, at its expense, if so requested by it at the time the same are furnished. (Emphasis added.)

On May 20, 1981, the plaintiff provided the DPSC testing laboratory with 24 sample instruments pursuant to contract Clause I14 (the samples). Shortly less than three months later, on or about August 10, 1981, the results of the lab tests were recorded. Thereafter, in a notice letter dated August 13, 1981, to Alan Scott Industries and signed by A.J. Kuders, the procurement contracting officer (PCO), the results of the tests were stated as follows:

Results of verification testing of your *second submittal*[1] of samples against subject contract are cited on DD Form 1222 dated 10 August 1981, copy furnished herewith. The samples do not comply with specification requirements; consequently, the supplies represented by the samples are unacceptable to the Government. (Emphasis added.)

1. While in his letter dated September 18, 1981, to defendant, plaintiff "request[ed] return of the two (2) referenced sets of samples," no "second submittal" was ever made to the defendant pursuant to Clause I14. In its opposition to defendant's motion for summary judgment, plaintiff admits that "no second set of samples was ever provided or requested." Moreover, defendant conceded in a letter dated September 24, 1981 to plaintiff that the reference to a "second submittal" was in error in that "[o]nly one submittal of . . . samples has been received and evaluated on subject contract." Thus, this point raises no issue of fact.

On September 1, 1981, the revised delivery date, plaintiff failed to deliver the contracted supplies. Thereafter, on September 8, 1981, a determination to terminate the contract for default was reviewed by Mary Long, Director of Medical Material; LTC T.G. Karrenbauer, Directorate of Medical Material; Lar Gnessin, SBA Advisor; Neil Bischoff, Director of Medical Material; and the Office of Counsel. All of the foregoing persons, except the Office of Counsel, checked the "yes" box to indicate their concurrence. The Office of Counsel checked neither the "yes" nor the "no" box. That same day, September 8, 1981, A.J. Kuders, the contracting officer, through Modification P00002, terminated the subject contract for default due to the plaintiff's "failure to make deliveries within the time required by the terms of the contract."

Approximately one week later, on September 14, 1981, the plaintiff telephoned the contracting officer to request the return of the samples. This request was again repeated by telephone and letter on September 18, 1981. While the contracting officer acknowledged in a letter to the plaintiff dated September 24, 1981, that he received the plaintiff's requests for the return of the samples and that they would be forwarded in the near future, it was not until December 15, 1981, that the DPSC testing laboratory actually returned the 24 sample instruments to the plaintiff.

Thereafter, due to plaintiff's failure to make a timely delivery, according to the defendant, the government repurchased identical forceps, through two negotiated procurements, that would have otherwise been provided under the defaulted contract. On March 29, 1982, under contract number DLA–82C–5194, 10,248 forceps were reprocured for $73,785.60, from the Surgical Instrument Company of America at a unit price of $7.20 each. Additionally, on June 8, 1982, under contract number DLA120–82–C–5480, 2,400 forceps were reprocured for $13,152.00 from American Medical Instruments at a unit price of $5.48 each. However, upon completion of the reprocurement contracts, their final prices were adjusted to $72,785.60 and $12,458.00, respectively. Nonetheless, pursuant to a notice dated October 4, 1982, the plaintiff was assessed $40,242.80 in excess costs incurred by the government.[2] The plaintiff challenges these reprocurement costs by arguing that there is insufficient proof of incurrence in the record.

## DISCUSSION

The broad questions presented by this action are (1) whether summary judgment lies because the government breached the contract by improperly terminating the contract for default, and (2) whether the government is, on this record, entitled to reprocurement costs. The grounds upon which the plaintiff alleges breach of contract, because he was improperly terminated for default, are as follows:

(1) the defendant failed to test, evaluate and return to the plaintiff the 24 samples within the time prescribed by the Defense Procurement Regulations;

(2) the contracting officer failed to issue a cure notice prior to termination;

(3) the contracting officer did not obtain the proper review from the Office of Counsel;

(4) the contracting officer did not provide the nearest SBA Regional Office with a copy of a cure notice or show cause notice letter;

(5) the contracting officer failed to notify the contractor by letter of the possibility of termination and request an explanation of the contractor's failure to perform the contract; and

2. The court notes that the excess reprocurement costs were based on the initial contracted prices which by our calculation should have resulted in net excess costs of $40,215.80 ($13,152.00 + $73,758.60–$46,694.80). However, in footnote 2 of the brief in support of its motion for summary judgment, the defendant concedes that upon completion of the reprocurement contracts, the plaintiff is ultimately liable to the government only in the amount of $38,548.80 ($72,785.60 + $12,458.00–$46,694.80).

(6) the contracting officer failed to revise the delivery schedule.

As to the foregoing, we find that there are genuine issues of material fact emanating from items (3), (5), and (6), discussed *infra.*

Against the defendant's counterclaim for reprocurement costs, the plaintiff raised a mixed question of fact and law by contending that the record "is insufficient to conclude as a matter of law that the reprocurement was reasonable under the circumstances."

Generally, the defendant responds to the foregoing with the hospitable argument that the contracting officer did comply with the regulations that were mandatory and to the extent that other regulations were not followed, it was because they were discretionary. Moreover, the defendant argues that since it is an uncontroverted fact that the plaintiff did *not* meet the stipulated delivery date of September 1, 1981, the default termination was proper, and it is entitled to excess reprocurement costs under the Default clause via summary judgment.

In light of the foregoing arguments, it is important to observe as a threshold matter that the party moving for summary judgment has the initial burden to show that there is no genuine issue as to any material fact and that he is entitled to judgment as a matter of law. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 160–61, 90 S.Ct. 1598, 1609–610, 26 L.Ed.2d 142 (1970); RUSCC 56(c).[3] Evidence and inferences must be viewed and drawn, in passing on said motion, in a light most favorable to the non-moving party. *D.L. Auld Co. v. Chroma Graphics Corp.,* 714 F.2d 1144, 1146 (Fed. Cir.1983). If the initial burden is not carried by the movant, then no defense is required of the opposing party. *Adickes,* 398 U.S. at 161, 90 S.Ct. at 1610. However, if the movant carries his burden, then the opposing party rests upon the mere allegations or denials of his pleading at his peril. *Id.* at 161, 90 S.Ct. at 1610; RUSCC 56(e).[4] Additionally, summary judgment must be carefully employed because an improvident grant may deny a party a chance to prove a worthy case and an improvident denial may force on a party and the court an unnecessary trial. *D.L. Auld Co.,* 714 F.2d at 1146–47.

A discussion now follows, seriatum, respecting each of the grounds, *supra,* averred by plaintiff upon which a breach of contract, for improper termination for default, may be premised as to each of which defendant contends it is entitled to summary judgment as a matter of law. Where appropriate, genuine issues of material fact are identified.

(1) *Requirement That Samples Be Tested, Evaluated, And Returned Within A Set Time Period Not Met*

The plaintiff faults the defendant for not returning the 24 samples within the time limits prescribed by Clause 115 of the DPSC Master Solicitation as a ground upon which a breach of contract may be premised. However, as the defendant points out, the contract in question did not contain Clause 115, on which plaintiff relies as one of the contract's provisions. Plaintiff has not shown one scintilla of evidence to contradict the defendant's submission which discloses that there was neither a Clause 115 in the contract nor any other clause addressing a time frame by which the sam-

---

**3.** RUSCC 56(c) states, in pertinent part, that "[t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

**4.** RUSCC 56(e) states, in pertinent part, that "[w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, *must set forth specific facts showing that there is a genuine issue for trial.* If he does not so respond, summary judgment, if appropriate, shall be entered against him." (Emphasis added.)

ples were required to be evaluated, tested and returned. Absent a specific mandatory time limit contained as a provision of the contract, the defendant cannot be held in breach of contract for returning the samples on December 15, 1981, notwithstanding the fact that that date was approximately four months after the defendant notified the plaintiff that said samples failed to meet the specifications.

Moreover, assuming, as we must, that the plaintiff did request the return of the samples *prior* to the September 1, 1981 delivery date,[5] which was not responded to by the defendant until December 15, 1981, the court has not been presented with any probative evidence establishing why the absence of the 24 samples precluded plaintiff from delivering timely. The evidence shows that on or about August 13, 1981, the plaintiff received the lab results from the defendant, which specifically particularized the deficiencies of the 24 samples submitted. A reading of Clause I14 clearly indicates that it did not preclude timely delivery of the items meeting the precise terms of the specifications even if the *samples* were unacceptable. Rather, the contract only precluded delivery of items represented by unacceptable samples. Thus, as long as the plaintiff conformed his production inventory to meet the contract specifications, amplified by using the lab test results, he should and would have been able to comply with the letter of the contract.

We find, therefore, that because there was no stipulated provision in either the contract or the regulations by which defendant was required to return the 24 samples, and since the failure to return same on August 17, 1981 did not preclude plaintiff from complying with the specifications and the test results and produce items in conformance therewith, no legal basis exists to conclude that such failure to return is a breach of contract. Partial summary

judgment is therefore granted defendant on this issue.

(2) *Requirement That A Cure Notice Be Issued Not Met*

■ The plaintiff contends that the defendant's failure to issue a cure notice, prior to termination of the contract, is also a valid legal basis upon which a breach may be predicated. There is no question that this notice was not issued. However, the court agrees with the defendant that, pursuant to 32 C.F.R. § 8–602.3(c) (1979), a cure notice is not obligatory if the termination is predicated upon the contractor's failure to make timely deliveries, as was the case here. Clearly then, the defendant cannot be held in breach of contract for failing to issue a cure notice that it was not required to do either by contractual provisions or applicable regulations. Partial summary judgment is therefore granted defendant on this issue.

(3) *Default Termination Reviews Obtained By The Contracting Officer Were Deficient*

The ASPR regulations provide that:
Where a default termination is being considered, *a decision as to the type of termination* action to be taken (*i.e.,* for default, for convenience or a no-cost cancellation) *shall be made only after review by procurement and technical personnel, and by counsel to assure the propriety of the proposed action.* (Emphasis added.)
32 C.F.R. § 8–602.3(a) (1979). On the form in which reviews are indicated (DPSC 3289), concurrence can be indicated by the reviewer, on the contemplated termination action, by either checking the "yes" or the "no" box. (App. 14 of Defendant's Motion for Summary Judgment.) The representative from the Office of Counsel did not check either box to reflect his conclusions; however, he did sign and affix a date next to his signature. All of the other review-

---

**5.** The plaintiff alleges and the defendant denies that on August 17, 1981, Dr. Udis requested

from Mr. Kuders the return of the 24 samples.

ers checked the "yes" box to indicate their approval of the default termination. The plaintiff contends that the failure of counsel to concur buttresses his argument that the contract was improperly terminated because regulation § 8–602.3(a) was violated, and therefore defendant breached the contract. The defendant counters with the argument that the plain language of the regulation only requires "review" and not concurrence, and that there is no violation inasmuch as his signature is indicative of the fact that there was a "review" by the Office of Counsel.

■ Based on the record, it is unclear whether the Office of Counsel intended to check the "yes" box but overlooked it or whether he signed the form to indicate his review but not his concurrence. Construing all doubts in favor of the plaintiff, and thus assuming counsel did not concur, a genuine issue of material fact arises as to whether the defendant (the contracting officer) obtained the proper reviews as required by the foregoing regulations. Thus, the court denies partial summary judgment for defendant on this issue.

(4) *Failure To Provide The SBA With A Cure Notice Or Show Cause Letter*

■ 32 C.F.R. § 8–602.3(b)(4) (1979) provides that:

If the contractor is a small business firm, the PCO ... shall *as a matter of information* provide the nearest Small Business Administration Regional Office where the contractor is located, a copy of *any* cure notice or show cause letter *when issued.* (Emphasis added.)

It is indisputable that neither of such notices was issued. Moreover, the court has already concluded, *supra,* that a cure notice was not mandated by the regulations, given the circumstances presented here, *i.e.,* termination for default was for failure to make delivery. (32 C.F.R. § 8–602.3(c).) Assuming, however, what is not as clear, that a show cause letter should have been issued, the defendant's failure to send such notice to the SBA does not, *ipso facto,* as the plaintiff argues, constitute a breach of

contract. Rather, as the defendant points out in its brief, because the forwarding of such notices to the SBA was required for "information[al]" purposes only, said provision does not create any substantive rights in favor of the contractor whereby the violation of which, as a matter of law, would constitute a breach of contract. Thus, the defendant's failure to forward either a cure or show cause notice to the SBA did not breach the contract and partial summary judgment is therefore granted defendant on this issue.

(5) *Failure To Notify The Plaintiff By Letter Of The Proposed Termination And Request An Explanation*

The language cited in 32 C.F.R. § 8–602.-3(b)(1) (1979) is arguably descriptive of a show cause letter, but is clearly not so entitled, and reads in pertinent part as follows:

If the foregoing consideration [i.e., § 8–602.3(a)] indicates that termination for default is appropriate, the PCO *should, if practicable,* notify the contractor by letter of the possibility of such termination. This letter *shall* call the contractor's attention to his contractual liabilities in the event the contract is terminated for default and request an explanation of the contractor's failure to perform the contract. The letter may further state that failure of the contractor to present such explanation may be taken as an admission that no valid explanation exists. When appropriate, the letter may invite the contractor to discuss the matter at a conference.

As mentioned earlier, it is irrefutable that the defendant issued neither a cure notice nor a show cause letter to plaintiff. It is also clear that no "letter" contemplated by the foregoing regulation was ever sent to plaintiff. The defendant contends, however, that because the termination was predicated upon the contractor's failure to make timely deliveries, it was required to do so under applicable regulations.

■ The court disagrees with the defendant's reading of the regulations. Ini-

tially, we observe that there are two sections of the regulations providing for notification to the contractor. 32 C.F.R. § 8-602.3(c) (1979) addresses cure notices which are mandatory if the termination is based on grounds *other than untimely delivery.* On the other hand, 32 C.F.R. § 8-602.-3(b)(1) (1979) addresses notification letters which should be issued, "if practicable," regardless of the specific cause of the termination. The defendant has not shown in its moving papers any evidence as to why it was *not* "practicable" for the PCO to "notify the contractor by letter of the possibility of such termination." Taking the evidence most favorable to plaintiff, as we must, who argues that it was not impracticable for the PCO to notify him by letter of the likely termination, a genuine issue of material fact is raised on the propriety of the termination. Partial summary judgment cannot, therefore, be granted on this issue in favor of defendant because the defendant, as the moving party, has not carried its initial burden of showing that there is no genuine issue of material fact concerning the practicality of issuing such notice letter.

Moreover, 32 C.F.R. § 8-602.3(b)(1) makes reference to "the foregoing considerations" in 32 C.F.R. § 8-602.3(a) (1979),[6] the latter of which mandates that:

> ... The PCO *shall* consider the following factors in determining whether to terminate a contract for default:
>
>> (i) the provisions of the contract, and applicable laws and regulations;
>>
>> (ii) the specific failure of the contractor and, unless time does not permit, the excuses, if any, for such failure;
>>
>> (iii) the availability of the supplies or services from other sources;
>>
>> (iv) the urgency of the need for the supplies or services and the period of time which would be required to obtain the supplies or services from other

sources as compared with the time in which delivery could be obtained from the delinquent contractor;

>> (v) the degree of essentiality of the contractor in the Government procurement program and the effect of a termination for default upon the contractor's capability as a supplier under other contracts;
>>
>> (vi) the effect of a termination for default on the ability of the contractor to liquidate guaranteed loans, progress payments, or advance payments; and
>>
>> (vii) any other pertinent facts and circumstances. (Emphasis added.)

See also *Fairfield Scientific Corporation v. United States,* 222 Ct.Cl. 167, 181, 611 F.2d 854, 862 (1979); *Gull Airborne Instruments, Inc. v. Weinberger,* 694 F.2d 838, 843 n. 5 (D.C.Cir.1982). To prove that the contracting officer took the above-cited seven factors listed in § 8-602.3(a) into consideration, the government submitted an affidavit of A.J. Kuders, the PCO, wherein he stated that subject contract was terminated for default "in compliance with the provisions of Defense Acquisition Regulation (DAR) 8-602.3 entitled 'Procedure for Default' ...." No other evidence was submitted that sheds any more light on what in fact Mr. Kuders considered when he decided to terminate the contract. The court cannot grant the defendant partial summary judgment on such a bland, conclusory, and over-broad affidavit. The record discloses that the defendant's proof is simply insufficient to determine whether, as a matter of fact and law, it properly exercised its discretion to terminate the contract. *See Schlesinger v. United States,* 182 Ct.Cl. 571, 581, 390 F.2d 702, 707-08 (1968). Taking the evidence most favorable to plaintiff, this doubt is particularly glaring with regard to the seven factors contained in § 8-602.3(a).

---

**6.** The defendant argues in its reply to plaintiff's response to defendant's motion for summary judgment that plaintiff should not be allowed to raise an issue concerning the PCO's compliance with § 8-602.3(a) because such contention was not raised in his complaint. This contention is frivolous because RUSCC 15(a) requires the court to freely grant leave to amend the pleadings when justice so requires. *Cf. Fairfield Scientific Corporation v. United States,* 222 Ct.Cl. 167, 183, 611 F.2d 854, 863 (1979).

**(6)** *Failure Of The Contracting Officer To Revise The Delivery Date*

In lieu of terminating the contract for default, 32 C.F.R. § 8–602.4 (1979) provides various alternative courses of action available to the PCO if the ultimate action is "in the best interest of the Government." One such alternative is to permit the contractor to continue performance of the contract under a revised delivery schedule. It is clear here that the PCO did not offer to ameliorate the problem by a revised delivery schedule. There is some evidence that such act would have been in the best interest of the government (although we do not now find), particularly where the reprocured items were not contracted for until March 1982 and June 1982 (the actual delivery date is unknown) long after the September 1, 1981 delivery date under the initial contract. Thus, the plaintiff argues that the PCO's failure to permit him to continue performance under the revised schedule was a breach of contract. The defendant responds to that allegation by arguing that because the PCO is vested with discretion to extend the delivery schedule, the regulation "does not create any substantive rights for the contractor.... Consequently, [the defendant argues] the PCO's refusal to grant an extension does not constitute a basis for a breach of contract claim."

▇▇▇ Although the court agrees with the defendant that the PCO, under § 8–602.4, has discretion to take alternative action in lieu of defaulting the contractor, "the exercise of that discretion must be fair and reasonable, not arbitrary or capricious" and in the best interest of the government. *Everett Plywood Corp. v. United States*, 206 Ct.Cl. 244, 256–57, 512 F.2d 1082, 1090 (1975). *See also Petrofsky v. United States*, 222 Ct.Cl. 450, 463, 616 F.2d 494, 501 (1980), *cert. denied*, 450 U.S. 968, 101 S.Ct. 1488, 67 L.Ed.2d 618 (1981). Thus the defendant, as the moving party, bears the initial burden of showing that the PCO's decision not to revise the delivery schedule was in the best interest of the government, and was neither arbitrary nor capricious so as to constitute a breach of contract. This the government has not done and plaintiff challenges defendant's failure to act as raising genuine issues of material fact. Thus, we agree with plaintiff that partial summary judgment must also be denied on this issue.

*Reprocurement Costs*

As previously stated, the government obtained the forceps, which were to have been originally supplied through the subject contract, by entering into two reprocurement contracts on March 29, 1982 and June 8, 1982, respectively. Ultimately the combined total price of these contracts was $85,243.60. The defendant seeks the excess costs incurred beyond the revised price of the initial contract (*i.e.*, $46,694.80), which aggregates to $38,548.80. The plaintiff, however, maintains that the record is "insufficient to conclude as a matter of law that the reprocurement was reasonable under the circumstances."

▇▇▇ Whether the contracting officer has acted reasonably, given the circumstances of a particular reprocurement, is a question of fact. *Astro-Space Laboratories, Inc. v. United States*, 200 Ct.Cl. 282, 308, 470 F.2d 1003, 1017–18 (1972). The contracting officer is under a duty to (a) act within a reasonable time after default; (b) obtain a reasonable price; and (c) mitigate the damages resulting from the contractor's default. 200 Ct.Cl. at 308, 470 F.2d at 1018. The government has not come forward with any evidence to prove that the PCO here acted accordingly. Nor has the government submitted any demonstrative proof of *actual costs incurred*. *See Whitlock Corp. v. United States*, 141 Ct.Cl. 758, 159 F.Supp. 602, *cert. denied*, 358 U.S. 815, 79 S.Ct. 23, 3 L.Ed.2d 58 (1958); *Fairfield Scientific Corp. v. United States*, 222 Ct.Cl. 167, 188, 611 F.2d 854, 865–66 (1979). Therefore, the court concludes that it would be inappropriate to grant defendant summary judgment on the issue of reprocurement costs in view of existing genuine issues of material fact,

*i.e.,* reasonableness of the reprocurement, and the fact of the incurrence of the cost.

## CONCLUSION

Based on the foregoing, defendant's motion for summary judgment is granted in part and denied in part as expressed above.

A pretrial order will issue simultaneously with this opinion.

IT IS SO ORDERED.